UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ELIJAH TURLEY,

                          Plaintiff,

          v.                                              **DECISION AND ORDER**
                                                          06-CV-794S
ISG LACKAWANNA, INC.,
ISG LACKAWANNA, LLC,
MITTAL STEEL USA LACKAWANA, INC.,
MITTAL STEEL USA INC., d/b/a ARCELOR-MITTAL STEEL,
LARRY D. SAMPSELL, GERALD C. MARCHLAND,
THOMAS JAWORSKI,

                          Defendants.

## I. INTRODUCTION

          Plaintiff Elijah Turley commenced this employment discrimination action by filing a

Complaint in the United States District Court for the Western District of New York.  (Docket

No. 1.)  Therein, he alleges that Defendants discriminated against him based on his race

(African American),  subjected him to a hostile work environment, retaliated against him,

and intentionally inflicted emotional distress.

          Plaintiff brings this action pursuant to Section 1981 of the Civil Rights Act of 1866,

42 U.S.C. § 1981 (hereinafter, § 1981); Title VII of the Civil Rights Act of 1964, 42. U.S.C.

§§ 2000(e) et seq. (hereinafter, "Title VII"); the New York State Human Rights Law, N.Y.

Exec. L. §§ 296 et seq. (hereinafter, "NYHRL"); and, common law of the State of New York.

          Presently before this Court are (1) Defendants' Motion for Summary Judgment

seeking dismissal of the Complaint in its entirety (Docket No.27)[1]; (2) Defendants' Motion

---

[1]In support of their motion, Defendants filed a Memorandum of Law; Rule 56 Statement of
Undisputed Facts; Declarations of Anthony Fortunato, Nevin Hope, James R. Grasso, Esq., Bruce
Marshall, Jeff Mathes, Thomas Jaworski, Donald Kandefer, Gerald Marchand, Andrew Mihalik, Carl

to Strike (Docket No. 92)[2]; and (3) Plaintiff's Cross-Motion to Strike and/or in the alternative for Leave to File a Sur-Reply (Docket No. 93)[3].

## II. BACKGROUND

### A.   Facts

Defendant ISG Lackawanna Inc., a wholly-owned subsidiary of International Steel Group Inc., purchased the steel galvanizing operation at the former Bethlehem Steel Plant in Lackawanna, N.Y. in May 2003.  (Defs.' Stmt. ¶ 1.)[4]  In January 2004, ISG Lackawanna Inc. became ISG Lackawanna LLC, a Delaware limited liability company.  (Id.)  In April 2005, Mittal Steel Co. purchased International Steel Group, Inc., the parent of ISG Lackawanna LLC and shortly thereafter changed the name to Mittal Steel USA Inc.  (Id. ¶ 2.)  In June 2006, Mittal Steel Co. and Arcelor merged to create ArcelorMittal Inc. (Id. ¶ 3.)  Shortly thereafter the name Mittal Steel USA Inc. was changed to Arcelor Mittal USA Inc. (Id. ¶ 3.) ISG Lackawanna LLC was then a wholly-owned subsidiary of ArcelorMittal

Nowakowski, Carl Pfeifer, and Larry Sampsell, with Exhibits; Reply Memorandum of law; Reply Declarations of James Reiter, Carl Pfeifer, Larry Sampsell, and Richard Schwartz; and Reply Declarations of James R. Grasso, Esq., Nevin Hope, Donald Kandefer, and Gerald Marchand, with Exhibits.

In opposition, Plaintiff filed a Memorandum of Law; Counter-Statement of Undisputed Material Facts; Response to Defendants' Statement of Undisputed Material Facts; Declarations of Judith A. Biltekoff, Esq., Elijah Turkey, and James Hickey, with Exhibits; Affidavits of Ron Drayton, Eulogia Rodriguez, Jr., Christopher J. Pino, Ph.D., and Syed S. Jaffri, M.D., with Exhibits; and Affidavits of Duane Hertel, Daniel Ruger, and Roy Cofield.

[2]In support of their motion, Defendants filed a Memorandum of Law; Reply Memorandum of Law; and Declaration of Larry D. Sampsell.

[3]In support of his motion and in opposition to Defendants' motion, Plaintiff filed a Memorandum of Law, and Reply Memorandum of Law.

[4]Referring to Defendants' Rule 56 Statement of Undisputed Facts, which contains citations to the record evidence in this case.  This Court has confirmed and is satisfied that the evidence cited supports the assertions therein.  Cf. Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 74 (2d Cir., 2001) (holding that factual allegations contained in a Rule 56.1 Statement that find no support in the record evidence must be disregarded and the record reviewed independently).

USA Inc. and changed its name to ArcelorMittal Lackawanna LLC (hereinafter, "Lackawanna Plant" or "Company").  (Id. ¶ 3.)

Plaintiff Elijah Turley (hereinafter, "Plaintiff") began his employment at Bethlehem Steel in 1995.  (Id. ¶ 8.)  He worked in the Pickler Department of the Lackawanna Plant since 1996.  (Id.)  Since May 2003, Plaintiff has been employed as a Process Operator successively by ISG Lackawanna Inc., ISG Lackawanna LLC, and ArcelorMittal Lackawanna LLC.   (Id.)

Defendant Larry Sampsell (hereinafter, "Sampsell") was the Manager of Labor Relations and Security at the Lackawanna Plant during the relevant time period.  (Id. ¶ 5.)  Defendant Gerald Marchand (hereinafter, "Marchand") was the Manager of Human Resources at the Lackawanna Plant from May 2003 to March 2007.  (Id. ¶ 6.)  After he retired, he continued to provide human resources services to the Plant as a consultant for several months.  (Id.)  Defendant Thomas Jaworski (hereinafter, "Jaworski") was the Area Manager of the Pickler and Tandem Mill Departments of the Lackawanna Plant from May 2003 to January 2007.  (Id. ¶ 7.)  Sampsell and Jaworski have both worked at the Bethlehem Steel/Lackawanna Plant in a management capacity since 1962.  (Id. ¶¶ 5, 7.)  Marchand has been an employee there since 1963.  (Id. ¶ 6.)

Production employees at the Lackawanna Plant, including Plaintiff, are represented by the United Steelworkers Union (hereinafter, "Union").  (Id. ¶ 14.)  The Union and International Steel Group, Inc. entered into a Collective Bargaining Agreement (hereinafter, "CBA"), which governs the terms and conditions of employment.  (Id.)  Article Four of the CBA prohibits discrimination and harassment in the workplace on the basis of race and

color.  (See Marchand Dec., Exhibit A; CBA pp.23-24, Article Four, Section (A)(1-6).)  It also prohibits the Company from retaliating against an Employee who complains of discrimination.  (Id.)

## B.   Procedural History

Plaintiff dually filed a charge of discrimination with the New York State Division of Human Rights ("NYSDHR") and the Equal Employment Opportunity Commission ("EEOC") on December 15, 2005.  (Compl. ¶ 19.)  Therein, Plaintiff alleged Defendants discriminated against him based on race/color and disability.  (Biltekoff Dec., Ex. V.)  He filed an amended charge on March 16, 2006, alleging further acts of discrimination based on race/color and disability.  (Compl. ¶ 19; Biltekoff Dec., Ex. V.)

On March 16, 2006, Plaintiff also filed a second charge of discrimination with the NYSDHR and EEOC, claiming retaliation and continued acts of discrimination.  (Compl. ¶ 20.)  An amendment to the second charge was filed on June 5, 2006.  (Id.)  The EEOC issued a Notice of Dismissal and Right to Sue on December 1, 2006.  (Id. ¶ 21.)  Plaintiff filed his Complaint with the Clerk of this Court on December 6, 2006.  (Docket No. 1.)

Plaintiff filed a third charge of discrimination with NYSDHR and the EEOC on December 21, 2007, alleging retaliation, hostile work environment, and continued discrimination.  (Biltekoff Dec., Ex. V.)

Defendants' filed their Motion for Summary Judgment on September 30, 2008 and their Motion to Strike on February 27, 2009.  (Docket No. 27, 92.)  Plaintiff filed his Cross-Motion to Strike on March 6, 2009.  (Docket No. 93.)

\*         \*         \*

4

The Court first considers the motions to strike, as those decisions may affect the disposition of the pending summary judgment motion.

### III.  MOTIONS TO STRIKE

**A.      Standard**

Defendants move to strike portions of Plaintiff's documents submitted in opposition to their motion for summary judgment on the basis that the documents allege new claims. Similarly, Plaintiff cross-moves to strike portions of Defendants' reply papers on the basis that they introduce new evidence and witnesses.

Rule 26 obligates a party to provide to the other party, without awaiting a discovery request, information such as names and addresses of witnesses and copies of documents the disclosing party has in its custody that support its claims or defenses.  Fed. R. Civ. P. 26(a).  Additionally, a party must supplement its disclosure or response in a timely manner if the party learns it is incomplete or incorrect, and if the additional information has not otherwise been made known to the other parties during the discovery process or in writing. Fed. R. Civ. P. 26(e).

Moreover, Rule 36 provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion. . . unless the failure was substantially justified or is harmless."  Fed.R.Civ.P. 37(c)(1).  This is to prevent the "sandbagging" of an opposing party with new evidence.  Ventra v. United States, 121 F.Supp.2d 326, 332 (S.D.N.Y. 2000).

In determining whether the Court should use its discretionary power to impose sanctions for Rule 26 violations, it should consider these four factors: (1) the proponent's explanation for failing to provide the subject evidence; (2) the importance of such evidence to the proponent's case; (3) the opponent's time needed to prepare to meet the evidence; and (4) the possibility of obtaining a continuance to permit the opponent to meet the evidence.  Outley v. City of New York, 837 F.2d 587, 589 (2nd Cir. 1988).

## 1.      Defendants' Motion to Strike

Defendants have moved to strike portions of: (1) Plaintiff's Memorandum of Law; (2) the Declaration of Elijah Turley; and (3) the Affidavit of Ron Drayton, on the ground that they improperly raise new claims after the close of discovery.  (Defs.' Memo in Support of Motion to Strike, p. 1.)

Specifically, Defendants argue that Plaintiff now alleges:

> (1) he was subjected to racial slurs and death threats over the Pickler Department radio on September 18, 2008;
>
> (2) co-worker Ron Drayton was subjected to racial slurs and death threats over the Pickler Department radio on September 19, 2008;
>
> (3) threatening graffiti was written on a window in the Company parking lot in October 2008; and
>
> (4) racial graffiti was written on a railcar in October 2008.

(Id.)

Defendants contend that these allegations may not be considered in opposition to summary judgment because they are "new claims."  (Id.)  Plaintiff avers that he has not raised any new claims in response to Defendants' motion for summary judgment.  (Pl.'s Memo. in Opposition to Motion to Strike, p.1.)  Rather, these four incidents are "part of a

continuing violation that resulted in a hostile work environment." (Id. at p. 2.)

It is well established that parties may not raise new claims in submissions in opposition to summary judgment motions. Hawana v. City of New York, 230 F.Supp.2d 518, 534 (S.D.N.Y. 2002). In this case, Plaintiff is not raising a new claim. He alleges in his Complaint that Defendants' conduct created a hostile and abusive working environment. (Compl. ¶ 84.) Plaintiff is now providing more circumstantial evidence to support his hostile work environment claim. Thus, the nature of Plaintiff's claim has not changed.

In addition, Plaintiff contends that "Defendants had a full and fair opportunity to investigate the ongoing harassment." (Pl.'s Memo. in Opposition to Motion to Strike, p. 2.) This is evidenced by the fact that on September 18, 2008, Plaintiff's counsel called Defendants' counsel to discuss the death threats and racial slurs, and sent a follow-up letter on September 19 detailing the continuing harassment and requesting documentation of any investigation. (Id. at p. 3; Biltekoff Supp. Dec., Ex. A.) Plaintiff's counsel also called Defendants' counsel on October 14, 2008 requesting information on the harassing graffiti at the Pickler Department. (Id.)

Despite Plaintiff's failure to formally supplement his discovery responses, the additional information was made known to Defendants in a timely manner. As required under Rule 26, the new information was brought to Defendants' attention on the day it occurred or soon after, and defense counsel acknowledged notice by agreeing to look into these events. Thus, Defendants were not deprived of the opportunity to investigate events alleged to have occurred at their own facility, and Plaintiff's failure to strictly comply with Rule 26(a) was harmless. Accordingly, those portions of Plaintiff's Memorandum of Law,

the Declaration of Elijah Turley and the Affidavit of Ron Drayton, which refer to events that occurred after the close of discovery, will be allowed.

### 2.    Plaintiff's Cross-Motion to Strike

Plaintiff has cross-moved to strike: (1) the Supplemental Declaration of Nevin Hope; (2) the Supplemental Declaration of Larry Sampsell; (3) exhibits attached to the Supplemental Declaration of Gerald Marchand; (4) portions of the Supplemental Declaration of Donald Kandefer; and (5) the Declaration of Richard Schwartz, on the ground they introduce new evidence or new witnesses in contravention of Rules 26(a)(1) and 37(c).  In the alternative, Plaintiff requests leave to file an amended complaint, or sur-reply.

### a.    Supplemental Declarations of Nevin Hope and Larry Sampsell.

Defendants assert they filed the Supplemental Declarations of Nevin Hope and Larry Sampsell in order to respond to Plaintiff's raising new allegations.  (Defs.' Reply in Support of Motion to Strike, pp. 4-5.)  Specifically, the Supplemental Declarations pertain to the death threats, racial slurs, and graffiti in 2008.

Defendants have not violated Rule 26(a), as the Supplemental Declarations are in response to the continuing hostile work environment violations that Plaintiff brought up in his opposition papers, and therefore could not have been disclosed at the time of discovery.  Moreover, because the Court declined to preclude Plaintiff's further hostile work environment allegations, it will not now preclude Defendants' response to same.  Plaintiff's motion to strike is denied as to the Supplemental Declarations of Hope and Sampsell.

### b.    Supplemental Declaration of Gerald Marchand.

According to Plaintiff, Exhibits A-N of the Supplemental Declaration of Gerald Marchand should be stricken because these attached documents purporting to be investigation notes were provided for the first time in Defendants' reply.  (Pl.'s Memo. in Opposition to Motion to Strike, p. 8.)  Plaintiff argues he is prejudiced because he was deprived of the opportunity to challenge the foundation or credibility of the evidence.  (Pl.'s Reply Memo. in Support of Cross-Motion, p. 1.)

Defendants argue that Plaintiff fails to state a proper basis on which the Exhibits attached to Marchand's Declaration should be stricken.  (Defs.' Reply in Support of Motion to Strike, p. 5.)  They state that the  notes from the investigation into Plaintiff's complaints contained in Exhibits A through M have been in Plaintiff's possession since August 2007; therefore, this is not the first time these documents were produced.  (Id. at p. 6.)  Furthermore, Exhibit N contains the notes of then Operations Manager Chris Richards,  as Manager of Human Resources at the time Mr. Marchand was competent to identify Mr. Richards's notes as a business record under Federal Rule of Evidence 802(6) [sic].  (Id. at p. 7.)  Also, Defendants state the notes are not submitted for their truth, but to establish that an investigation occurred.  (Id.)

It is apparent that the business records pertaining to Defendants' investigation of the alleged harassment are important to their defense of this case.  Furthermore, the Court finds Exhibit N admissible as non-hearsay if offered not for its truth, but to show that an investigation was done.  See LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 205 (2nd Cir. 2005) (Evidence considered on summary judgment by a district court "must generally be admissible evidence.").  Moreover, Plaintiff does not deny that he

9

had been in possession of Exhibits A through M since 2007.  In addition, Exhibits A through M were responsive to his request for information regarding investigations of the continuing harassment.   Therefore, Plaintiff would not be prejudiced by allowing this evidence. Plaintiff's motion to strike the Supplemental Declaration of Marchand is denied.

**c.    Supplemental Declaration of Donald Kandefer.**

According to Plaintiff, ¶¶ 3-9 and Exhibit B of Donald Kandefer's Supplemental Declaration lack foundation and should be stricken as unreliable.   (Pl.'s Memo. in Opposition to Motion to Strike, p. 9.)  Furthermore, Plaintiff argues the declaration is not "supplemental" in that it undermines Kandefer's original testimony and raises new issues regarding how hours at the Lackawanna Plant were reported.  (Pl.'s Reply in Support of Cross-Motion to Strike, p. 1.)

Defendants contend that Kandefer's Supplemental Declaration concerns matters properly before the Court on Defendants' summary judgment motion, and is responsive to Plaintiff's questions regarding his job duties and procedures.  (Defs.' Reply in Support of Motion to Strike, p. 5.)  Also, Exhibit B is the same document attached to Kandefer's original declaration, which is a record of employee hours in the Pickler Department.   (Id.)

The original Kandefer Declaration states that he is the Timekeeper, Payroll and Accounts Receivable Coordinator at the Lackawanna Plant. (Kandefer Dec. ¶ 1.) As such, he is responsible for entering employee hours into the computer system.  (Id. ¶ 2.)  The computer then calculates the employee's weekly pay based on the number of hours worked (including overtime) and the employee's base pay rate, plus any other related items.  (Id.)

Kandefer's Supplemental Declaration was made in response to Plaintiff's assertion

10

that his original declaration contradicted his deposition testimony. (Kandefer Supp. Dec. ¶ 1.) During his deposition, Kandefer was asked if the record keeping methods had changed when ownership of the Plant changed. (Id. ¶ 3.) Kandefer replied that they had not, which he still asserts was an accurate response. (Id.) He states that after the change of ownership, he collected employees' time from their sheets and entered them into the computer system the same way he had been. (Id.) Kandefer clarified that he only inputs regular time, and payment for overtime is calculated by the computer. (Id. ¶¶ 8-9; Kandefer Dep. 13:8-14:5.)

However, what did change was the way that employee hours were reported for the Lackawanna Plant. (Kandefer Supp. Dec. ¶ 3.) Kandefer states that the various owners of the Lackawanna Plant wanted employees' hours reported differently for their own internal processes. (Id. ¶ 4.) For instance, under the CBA, only overtime of four hours or more, referred to as an "overtime occurrence," is reported, for the Plant's purposes, as overtime. Therefore, if an employee worked an eight hour day as overtime, only four hours would be reported as overtime for the Plant's records. This reporting of overtime does not effect Kandefer's job of recording employee time in the payroll system. The computer would consider the eight hours as overtime and the employee would be paid accordingly.

The chart in Exhibit B in Kandefer's original declaration shows only the number of hours which are considered overtime under the CBA. (Kandefer Dec. ¶ 22.) The chart included in Kandefer's Supplemental Declaration shows the unadjusted overtime hours of Pickler Department Employees, meaning it includes all overtime worked. This shows how overtime was reported prior to the change of ownership in May 2003. Regardless of which overtime chart is used, Kandefer avers that the relative ranking of overtime of the Pickler

11

Department employees is the same since the way the hours were reported applies to all employees in the same manner.[5]  (Kandefer Supp. Dec. ¶ 5.)

Because Kandefer's Supplemental Declaration clarifies what exactly changed in regards to the reporting of employee hours with the change of ownership, the Court finds it to be truly supplemental and does not consider it new evidence.  Furthermore, admission of the Supplemental Declaration would not be prejudicial to Plaintiff, since it does not substantially change the overall ranking of the employees.  And, Plaintiff does not specify what further investigation he would need in order to respond to the declaration.  Also, this information is probative in regards to Plaintiff's discrimination claims.  Plaintiff's motion to strike Kandefer's Supplemental Declaration is denied.

### d.    Declaration of Richard Schwartz.

According to Plaintiff, the Declaration of Richard Schwartz should be stricken because the witness's identity was not disclosed pursuant to Rule 26 until February 25, 2009, five months after Defendants filed their original motion papers and two months after Plaintiff's response was filed.  (Pl.'s Memo. in Opposition to Motion to Strike, p. 9.)  Plaintiff argues he has been denied the opportunity to depose the witness. (Pl.'s Reply Memo. in Support of Cross-Motion, p. 1.)

Defendants state that their identification of Mr. Schwartz as a witness was timely under Rule 26(a), which requires supplemental information to be provided thirty days

---

[5]Compare Plaintiff's overtime ranking during the years 2003-2008 in the original Declaration of Kandefer to his overtime ranking of the same years in his Supplemental Declaration.  The unadjusted overtime rankings are the substantially the same as the overtime rankings adjusted to reflect the change in the way overtime hours were reported.  The only difference is that Plaintiff went from 7th out of 14 employees in the adjusted rankings in the year 2007 to 8th out of 14 in the unadjusted rankings.  Kandefer Dec. ¶ 22; Kandefer Supp. Dec. ¶7.)

before trial.  Fed. R. Civ. P. 26(a)(3).  (Defs.' Reply in Support of Motion to Strike, p. 8.)

Defendants assert that his identity was not initially known and they did not intend on relying

on his testimony regarding the placement of surveillance cameras, therefore he was not

included in their initial Rule 26(a) disclosures.  (Defs.' Reply in Support of Motion to Strike,

p. 8.)  It was only after Plaintiff submitted affidavits of employees testifying where the

surveillance cameras were directed that Defendants had a need for Mr. Schwartz's

testimony.  (Id.)  Sampsell attests that in mid-February 2009, he contacted PBS

Consultants, the company hired to install the cameras, to find out the name of the

employee who installed them.  (Sampsell Dec. in Opposition to Motion to Strike, ¶ 3.)

Defendants state they provided Plaintiff with Mr. Schwartz's name and contact information

as soon as they obtained it in February 2009.  (Defs.' Reply in Support of Motion to Strike,

p. 9.)  Furthermore, Plaintiff was not prejudiced by this delay, as he already had ample

opportunity to discover Mr. Schwartz's identity and served a subpoena on the company on

August 14, 2007.  (Id.)

Defendants are correct that Rule 26(a)(3) requires disclosures relating to the name

and contact information of witnesses, their testimony, and exhibits to be submitted at least

30 days before trial, yet they cannot use section (a)(3) to circumvent the requirements of

(a)(1).  In other words, Defendants are not insulated because they provided the identity of

the witness according to section 26(a)(3) without disclosing their information pursuant to

(a)(1).  Nevertheless, Plaintiff was not prejudiced, as he does not dispute that he had

served a subpoena on the witness in 2007 and had the opportunity to take depositions and

further investigate the placement of the surveillance camera.  In fact, Defendants were not

put on notice that the view of the surveillance camera was at issue until it was mentioned

in the Affidavit of Daniel Ruger filed by Plaintiff on December 30, 2008.  (Ruger Aff. ¶ 18.)

Moreover, it appears that the information regarding the witness had been supplemented

in a timely manner after Defendants identified him.  Plaintiff's motion to strike the Schwartz

declaration is denied.

      Based on the foregoing, Plaintiff's cross-motion to strike is denied.

*    *    *

      Plaintiff's request for leave to amend his Complaint is denied.  Because the Court

concludes that no new claims have been raised in opposition papers, there is no need to

amend.

      Moreover, Plaintiff's request to file a sur-reply is denied.  Plaintiff does not specify

what he needs to respond to in his sur-reply or what additional investigation is needed.

<h3 style="text-align:center">IV.  SUMMARY JUDGMENT</h3>

**A.**    **Standard**

      Federal Rule of Civil Procedure 56 provides that summary judgment is warranted

where "the pleadings, the discovery and disclosure material on file, and any affidavits show

that there is no genuine issue as to any material fact and that the movant is entitled to

judgment as a matter of law."  FED. R. CIV. P. 56(c)(2).  A "genuine issue" exists "if the

evidence is such that a reasonable jury could return a verdict for the non-moving party."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202

(1986).  A fact is "material" if it "might affect the outcome of the suit under governing law."

Id.

      In deciding a motion for summary judgment, the evidence and the inferences drawn

14

from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S.Ct.1598, 1609, 26 L.Ed.2d 142 (1970). Summary judgment is proper "only when reasonable minds could not differ as to the import of evidence." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

In the context of employment discrimination cases, the United States Court of Appeals for the Second Circuit has explicitly cautioned district courts to use extra care when deciding whether to grant summary judgment because "the ultimate issue to be resolved in such cases is the employer's intent, an issue not particularly suited to summary adjudication." Eastmer v. Williamsville Cent. Sch. Dist., 977 F. Supp. 207, 212 (W.D.N.Y. 1997) (quoting Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994)). Nonetheless, "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985). Indeed, the Second Circuit has noted that "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to commercial or other areas of litigation." Id.

## B.    Disparate Treatment

Plaintiff alleges he has been discriminated against because of his race in regards to overtime, pay, job training, absence and leave from work, and being monitored on the job.

15

It is well settled that in discrimination cases where there is no overt evidence of discriminatory conduct, claims brought under Title VII, § 1981, and the NYHRL are analyzed under the burden-shifting analysis first set forth by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed.2d 668 (1973). The burden-shifting test first requires that the plaintiff establish a *prima facie* case of discrimination.

"The burden of establishing a *prima facie* case of disparate treatment is not onerous." Texas Dep't of Comt'y Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 1094, 67 L. Ed.2d 207 (1981); see also Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000) (characterizing the burden as "minimal"). To state a *prima facie* case, a plaintiff must show that (1) he is a member of a protected class, (2) he is qualified for his position, (3) he suffered an adverse employment action, and (4) the circumstances of the adverse action give rise to an inference of discrimination. Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) (citing McDonnell Douglas, 411 U.S. at 802). Defendants contend that Plaintiff cannot satisfy the third and fourth elements of a *prima facie* case.

As to the third element, an "adverse employment action is one that affects the terms, privileges, duration or conditions of employment." Yerdon v. Henry, 91 F.3d 370, 378 (2d Cir. 1996). Plaintiff avers that he has been subject to multiple adverse employment actions including: denial of overtime, unequal pay, failure to train, unequal treatment under the Absence and Leave Policy, and excessive monitoring.

To satisfy the fourth element, a plaintiff must show that the circumstances of the alleged adverse employment action give rise to an inference of discrimination. Evidence

showing that the plaintiff was treated "less favorably than other similarly situated employees outside [the] protected group" is one method of raising an inference of discrimination.  Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003).  When employing this method, the other employees to whom a plaintiff compares himself must be "similarly situated" in all material respects and must have engaged in comparable conduct for which they were treated differently.  Shumway v. United Parcel Service, Inc., 118 F.3d 60, 64 (2d Cir. 1997) (citing Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992).

     If the plaintiff meets this initial burden and establishes a *prima facie* case, a rebuttable presumption of discrimination arises, and the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action.  Burdine, 450 U.S. at 254.  "This explanation must be 'clear and specific.' " Gallo, 22 F.3d at 1226 (quoting Meiri, 759 F.2d at 997).  If the defendant succeeds in making this showing, "the presumption of discrimination arising with the establishment of the *prima facie* case drops from the picture." Weinstock, 224 F.3d at 42 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 125 L. Ed.2d 407 (1993)).

     Assuming that the defendant meets its burden at the second stage, the burden returns to the plaintiff to prove that the defendant's discrimination was intentional.  In this regard, the plaintiff must produce "evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." Weinstock, 224 F.3d at 42.  "Where a plaintiff has alleged that an employer's reasons for an adverse employment action are pretextural, all reasonable inferences must be drawn in favor of the plaintiff's showing of pretext."  Hudson v. Greyhound Lines, Inc., No. 04 Civ. 10285, 2008 WL

17

819687 at *7 (W.D.N.Y. 2008) (quoting <u>Joseph v. Manhattan & Bronx Surface Transit</u> <u>Operating Auth.</u>, No. 96 Civ. 9015, 2004 WL 1907750, at *14 (S.D.N.Y. Aug. 25, 2004)). "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." <u>Id.</u>  However, "[i]t is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination." <u>Id.</u> (quoting <u>St. Mary's</u>, 509 U.S. at 519).

### 1.    Denial of Overtime

Plaintiff alleges he has been denied overtime in both the Pickler Department and the Shipping Department since 2004 because of his race.  (Pl.'s Memo. in Opposition to Motion for Summary Judgment, pp. 37-38.)  Defendants argue that the amount of overtime Plaintiff worked is not materially different when compared to all his white co-workers. (Defs.' Memo in Support of Motion for Summary Judgment., p . 47.)

### a.    Pickler Department

Plaintiff avers he was denied overtime while Frank Pelc (hereinafter, "Pelc") and Daniel Ruger (hereinafter, "Ruger"), two white Process Operators, were regularly allowed to arrive one-half hour early for the 7am-3pm shift, stay one half-hour after their 3pm-11am shift, or come in on weekends.  (Pl. Dep. 92-93, Dec. 18, 2007.)  Plaintiff states that the only time he was permitted to arrive early was to attend a scheduled crew meeting.  (Pl. Dec. ¶ 44.)

The denial of overtime may constitute an adverse employment action in some circumstances.  <u>See</u> <u>Little v. National Broadcasting Co., Inc.</u>, 210 F.Supp.2d 330, 397 (S.D.N.Y. 2002) (noting plaintiff could be subject to an adverse employment action where

he produced evidence he incurred an actual loss in income because of lost overtime even though he remained at the same pay level); see also Faggiano v. Eastman Kodak Co., 378 F.Supp.2d 292, 306 (W.D.N.Y. 2005) (finding plaintiff suffered an adverse employment action where he lost opportunities for earning overtime benefits and his title and job duties were altered.).

However, Plaintiff has not presented sufficient evidence that he has been treated unfavorably in the distribution of overtime work.  It is clear that Plaintiff received overtime assignments in the Pickler Department continuously from 2003 through 2008.  In fact, he often placed among the top half of employees for overtime hours worked.[6]  Since Plaintiff argues he was denied overtime before work, after work, and on the weekends, it is unclear how he was able to obtain so many overtime hours through the years.

Furthermore, Plaintiff does not identify any instance where he was denied requested overtime work so that it could be given to others.  See Ramsey v. New York City Health & Hosp. Corp., No. 98 CIV. 1594, 2000 WL 713045, at * 8 (S.D.N.Y. June 2, 2000) (Plaintiff alluded in his Amended Complaint to times when he was denied requested overtime so that it could be given to others, but after full discovery, presented no specific evidence of disparate treatment in the assignment of overtime work.).  He simply asserts, in conclusory fashion, that he was not informed he could work overtime or was not allowed to work overtime.

Therefore, there is not enough for a rational jury to hold that Plaintiff was denied

---

[6]In both the unadjusted (total overtime hours) and adjusted (overtime under the CBA) overtime rankings, Plaintiff ranked 7th or better among the 14 Pickler Department employees for overtime, except for 2007 when Plaintiff ranked 8th in the unadjusted ranking of employees.  (See Kandefer Dec. ¶ 22; Kandefer Supp. Dec. ¶ 7.)

overtime based on his race, or that similarly situated employees were treated preferentially with respect to overtime opportunities.

### b. Shipping Department

To the extent Plaintiff bases his claim on lack of overtime in the Shipping Department, the claim fails. Plaintiff fails to put forth any evidence that he was denied overtime in that department.

*        *        *

Based on the foregoing, summary judgment on Plaintiff's discrimination claim based on denial of overtime is granted.

### 2. Unequal Pay

To establish a *prima facie* case of unequal pay for equal work, a plaintiff must show: (1) that he is a member of a protected class; (2) that he was paid less than similarly situated non-members of his protected class; and (3) evidence of discriminatory animus. Cruse v. G & J United States Publishing, 96 F.Supp.2d 320, 326 (S.D.N.Y. 2000). With respect to the second element, Defendants dispute that Plaintiff was paid less for working as a Process Operator than white employees. (Defs.' Memo. in Support of Motion for Summary Judgment, p. 49.)

The CBA establishes seven job categories and five corresponding labor grades for the Lackawanna Plant, with Labor Grade 5 being the highest paid. (Defs.' Stmt. ¶ 15.) Process Operators are paid at a Labor Grade 2, as are Slitter Operators. (Id.) The Recoiler Operator jobs are classified as a Labor Grade 3. (Id.) And, the Senior Operating Technician is Labor Grade 5. (Id.)

The CBA provides that an employee working a particular job is to be paid an hourly rate normally assigned to that job.  (Pfeifer Dec. ¶ 17.)  When a Union employee works a job at a higher or lower labor grade than his or her normal job, the employee is supposed to indicate such change on his or her time sheet.  (Sampsell Dec. ¶ 4.)  Kandefer is responsible for manually adjusting an employee's base rate where indicated on their time sheet.  (Id. ¶ 5.)

Plaintiff argues he was paid at a Labor Grade 2 while performing the Process Operator job whereas Pelc was paid at Labor Grade 3.  (Pl.'s Memo. in Opposition to Motion for Summary Judgment, p. 45.)  Also, Plaintiff was paid at a Labor Grade 2 while breaking in on the Recoiler and Slitter jobs whereas Ruger was paid at a Labor Grade 3. (Id. p. 46; Ruger Aff. ¶ 13.)  Pelc and Ruger are similarly situated to Plaintiff because they were classified as Process Operators and therefore were normally designated as Labor Grade 2 for payroll purposes. (Ruger Aff. ¶ 4; Pelc Dep. 14-23.)  Thus, Plaintiff has sufficiently established the second element of his *prima facie* case.

Defendants concede that Pelc and Ruger were paid at a higher rate than Plaintiff while working the same job, but state this was because they were reassigned to those positions for "company convenience," a legitimate, non-discriminatory reason.  (Defs.' Memo. in Support of Motion for Summary Judgment, pp. 50, 52.)  Defendants assert that "company convenience" applies where an employee is reassigned to work a lower grade position to fill in for a sick co-worker, or so that another employee can "break in" or gain experience in another job, or to fulfill a labor need in another department.  (Id.)  In those instances, the employee is to be paid at their regular rate.  (Id.)

Defendants insist that "company convenience" is covered under an oral agreement

21

between the Union and the Lackawanna Plant, and applies to all employees equally.  (Id. at p. 51.)  Article 5, Section A of the CBA, entitled "Local Working Conditions," provides, in relevant part:

> "The term Local Working Conditions. . . means specific practices or customs which reflect detailed application of matters within the scope of wages, hours of work or other conditions of employment, including local agreements, **written or oral**, on such matters.   It is recognized that it is impracticable to set forth in this Agreement all of these working conditions, which are of a local nature only. . ."

(Pfeifer Supp. Dec., Exhibit B, Art. Five, Section A, ¶ 1.) (Emphasis added.)

Carl Pfeifer (hereinafter, "Pfeifer), the Operations Manager and former Controller of the Lackawanna Plant, testified that the agreement regarding "company convenience" was a Local Working Condition already in existence at the time of the CBA and was therefore not required to be reduced to writing.[7]  (Pfeifer Supp. Dec. ¶ 8.)

Defendants argue that where "company convenience" does not apply and an employee is still paid at a higher rate, it is simply because that employee has violated the Company policy to indicate on their time sheet when they should be paid at a lower Labor Grade.  (Id.)  These time sheet errors were not always caught by personnel.  (Id.)  They assert that there is no evidence the Lackawanna Plant enforced this policy unequally based on race.  (Id.)

Plaintiff argues that "company convenience" was raised for the first time in Defendants' summary judgment motion and they provide no foundation for or written

---

[7]The CBA states, "[a]s of the Effective Date, all **future** Local Working Conditions must be reduced to writing and signed by the Plant Manager and the Local Union President/Union Chair.  (Pfeifer Supp. Dec., Exhibit B, Art. Five, Section A ¶ 6.) (Emphasis added.)

documentation of any such policy.  (Pl.'s Memo. in Opposition to Motion for Summary Judgment, p. 46, fn.16.)  In fact, Pfeifer, the one who testified to "company convenience" in his declaration, was the same person who stated at his deposition that the CBA constituted the "entire agreement" between the Union and Lackawanna Plant.  (Id. at p. 46.)  Thus, Plaintiff asserts that Defendants' proffered legitimate business reason is really a pretext and gives rise to an inference of discrimination.  (Id. at p. 47.)

Because there is a question as to what employees are supposed to be paid when they are temporarily reassigned to a job in a different Labor Grade, Plaintiff has raised a material issue of fact and summary judgment is denied on his claim of unequal pay.

### 3.    Failure to Train

Failure to train is considered an adverse employment action when it materially affects a plaintiff's "opportunities for professional growth and career advancement or directly on a plaintiff's compensation."  Nakis v. Potter, No. 1 Civ. 10047, 2004 WL 2903718 at * 20 (S.D.N.Y. Dec. 15, 2004).  Plaintiff alleges that Defendants failed to properly train him so that he could "break in" to higher paying positions, while white employees, such as Pelc and Ruger, were given the proper training and qualifications. (Pl.'s Memo. in Opposition to Motion for Summary Judgment, p. 47.)  Defendants assert that this failure to train was a mere inconvenience and did not amount to an adverse employment action.  (Defs.' Memo. in Support of Motion for Summary Judgment, p. 39.)

### a.    Shipping Department

Plaintiff first argues he did not receive any formal training to work in the Shipping Department.  (Pl.'s Memo. in Opposition to Motion for Summary Judgment, p. 48.)

Defendants counter that Plaintiff learned on the job, which was how training at the Lackawanna Plant was normally done.  (Mihalik Aff. ¶ 9; Sampsell Dec. ¶ 67.)

Sampsell testified that Plaintiff began working in the Shipping Department performing Bundling duties in August 2006.  (Sampsell Dec. ¶ 63.)  This was the earliest he could be assigned to work in the department due to several factors including: (1) the work and overtime requirements of the employee's home department, (2) the staffing needs of the other department, and (3) compliance with the CBA.  (Id.)  In 2006 Plaintiff worked 20 shifts in the Shipping Department, 13 of them being overtime under the CBA. (Id. ¶ 65, Ex. K.)

Evidence that Plaintiff did in fact perform Bundling work in the Shipping Department indicates that the lack of formal training did not adversely affect his career or compensation.  See Hill v. Raboy-Braustein, 467 F.Supp.2d 336, 354 (S.D.N.Y. 2006) ("There was no evidence [the plaintiff] suffered a loss of pay, change in responsibility, or any other adverse employment action because of her allegedly inadequate training).

Furthermore, Plaintiff produces no evidence that he was treated any differently than similarly situated white co-workers.  (Defs.' Memo. in Support of Motion for Summary Judgment, p. 42.)  Plaintiff testified that he does not know what kind of training his co-workers received, what jobs they trained for in the Shipping Department, or when they received their training.  (Id. at p. 42-43.)  Thus, Plaintiff has failed to establish a *prima facie* case as related to his Shipping Department claim.

###### b.    Slitter Operator

Next, Plaintiff asserts he attempted to become qualified as a Slitter Operator, but

was returned to the Process Operator position because Jaworski refused to qualify him. (Pl.'s Memo. in Opposition to Motion for Summary Judgment, p. 48-49.) Defendants state that Plaintiff was in fact assigned to the Slitter to learn the job, and, as Plaintiff testified, it was his decision to end his training.  (Defs.' Memo. in Support of Motion for Summary Judgment, p. 38.)

Andrew Mihalik (hereinafter, "Mihalik"), Training Coordinator at the Lackawanna Plant, testified that in 2004 or 2005, he asked the Pickler Department employees whether they wanted to cross-train to learn other jobs.  (Mihalik Dec. ¶ 6.)  Plaintiff stated he wanted to try the Slitter position.  (Id.)  However, after a week of training on the Slitter, Plaintiff informed Mihalik he did not want to continue.  (Id. ¶ 7.)  Plaintiff did not explain why he wanted to quit, and did not request to be trained for any other position in the Department. (Id.)

Plaintiff testified he ended his training because Jaworski was harassing him through excessive monitoring of his training.  (Pl. Dep. pp. 68-73, July 2, 2008.)  Defendants state that Jaworski monitored Plaintiff in the same way he monitored his white co-workers. (Defs.' Reply Memo. in Support of Motion for Summary Judgment, p. 20.)

Excessive monitoring and oversight of work do not constitute adverse employment action.  Fleming v. Verizon N.Y., Inc., No. 03 Civ. 5639, 2006 WL 2709766 at *11 (S.D.N.Y. Sept. 22 2006); see Castro v. New York City Bd. of Educ. Personnel, No. 96 Civ. 6314, 1998 WL 108004, at *7 (S.D.N.Y. March 12, 1998) ("[A]lthough reprimands and close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions."). However, excessive monitoring and oversight, coupled with other negative results, may be

25

indicative of an adverse employment action.  <u>Uddin v. City of New York</u>, 427 F.Supp.2d 414, 429 (S.D.N.Y. 2006).  Such negative results include a decrease in pay, being placed on probation, or an adverse affect on any other term, privilege or condition of his employment.  <u>Honey v. Cnty. of Rockland</u>, 200 F.Supp.2d 311, 320-21 (S.D.N.Y. 2002) (citing <u>Slinkosky v. Buffalo Sewer Authority</u>, 97 Civ. 0677, 2000 WL 914118, at *8 (W.D.N.Y. June 29, 2000)).

Even if Plaintiff can show Jaworski's monitoring negatively affected the conditions of his employment, he has still not established that similarly situated white employees were monitored any less.  Jaworski testified it was his common practice to walk through the Pickler Department during each shift to observe the employees and equipment, making sure the production line was running smoothly.  (Jaworski Dec. ¶21.)  Duane Hertel and Mark Zimmer, two white employees, both testified that Jaworski monitored their performance and often stood for periods of time to observe their work.  (Hertel Dep. 13:9, January 8, 2008; Zimmer Dep. 15-16, January 8, 2008.)

Because the record shows Plaintiff was given training and decided on his own accord not to finish, and he has not provided evidence that he was monitored more than white employees, he has failed to establish a *prima facie* case of discrimination with regard to the Slitter Operator training.

### c.    Recoiler Operator

Plaintiff also argues he was denied sufficient training to qualify as a Recoiler Operator.  (Pl.'s Memo. in Opposition to Motion for Summary Judgment, p. 48.)  Plaintiff states that he tried to "break in" on the Recoiler on three different occasions and was

denied each time.  (Pl. Dec. ¶ 47; Pl.'s Memo. in Opposition to Motion for Summary Judgment, p. 49.)  In June 2008, the Union finally notified Plaintiff he could break into the position.  (Id. at p. 49.)

Plaintiff was trained by Ronald Drayton (hereinafter, "Drayton"), an African American and qualified Recoiler Operator.  (Pl. Dec. ¶ 47.)  When Drayton felt Plaintiff was fully trained and able to perform the job, Area Manager Carl Nowakowski (hereinafter, "Nowakowski") took him off the job for a week, and refused to qualify him until July 2008. (Pl. Dep. 61:16-23, July 2, 2008; Pl. Dec. ¶ 48.)

Defendants argue Plaintiff offers no evidence regarding the training of similarly situated employees such that a factfinder could conclude that race discrimination occurred. (Defs.' Reply Memo. in Support of Motion for Summary Judgment, p. 21.)  Indeed, the only person whom Plaintiff claims was similarly situated was Ruger.  (Pl.'s Memo. in Opposition to Motion for Summary Judgment, p. 48.)  Plaintiff alleges Ruger was trained longer, but puts forth no evidence of what kind of training he received and how he became qualified. Furthermore, Drayton, an African American, was a qualified Recoiler and was given the responsibility to train Plaintiff.  This weighs against an inference of discrimination based on race.  Without more, the Court cannot find that Plaintiff established *a prima facie* case of discrimination.

Based on the foregoing, Defendants' motion for summary judgment regarding denial of training is granted.

### 4.    Absence and Leave Policies

Plaintiff argues that the Absence and Leave Policies at the Lackawanna Plant are

not equally applied to black and white employees.  (Id. at p. 52.)  Plaintiff believes that Sampsell and Jaworski excuse absences for medical and personal leave of white employees, but do not do the same for black employees.  (Id.)

The Absence Policy, in relevant portion, states:

> "Any failure of an employee to work a scheduled shift, or accepted overtime shift, is counted as an absence... When an employee has an absence... an occurrence will be created."

(Sampsell Dec., Exhibit F.)

Each individual occurrence is considered an adverse disciplinary action and is included in the employee's personnel records.  (Id.)  After the fourth occurrence, the employee receives a written warning.  (Id.)  After the fifth occurrence, the employee is suspended one day without pay.  (Id.)  After the sixth, the employee is suspended for 3 days without pay.  (Id.)  And after the seventh, the employee is discharged.  (Id.)  Absences older than 12 months are not considered in imposing discipline.  (Id.)

The Policy allows for several exceptions including those for subpoenaed witnesses and qualified sickness and accidents.  (Id.)  However, Sampsell testified that he has excused employee's absences for reasons other than those stated in the Policy.  (Sampsell Dec. ¶ 43.)  He produced evidence that employees, including Plaintiff, had a number of unauthorized absences from 2003 to 2008, but not every one was counted as an occurrence.  (Sampsell Dec., Ex. H, BB.)  In contrast, some employees did not have any excused unauthorized absences, such as Mark Zimmer, a white employee.   (Id.)  Furthermore, there is evidence that white employees were given written warnings and

28

disciplined under the Policy including Kevin Daley, Richard Hagerdon, James Neubauer, Daniel Ruger, and Mark Zimmer.   (Sampsell Dec., Ex. I.)

Plaintiff does not specify an employee of any race whose absence was excused or whose leave was granted while Plaintiff, under the same circumstances, was treated less favorably.

Although Plaintiff suffered an adverse employment action by being penalized under the Absence and Leave policy, he has not shown that similarly situated white employees were treated more favorably than him in regards to the policy.  Thus, Defendants' summary judgment motion for discrimination based on the Absence and Leave Policy is granted.

### 5.    Monitoring

Finally, Plaintiff states that he has been excessively monitored by Defendants. (Pl.'s Memo. in Opposition to Motion for Summary Judgment, p. 50.)  He asserts that he alone has been monitored because he is black and because he complained about racial discrimination and harassment.   (Id.)  Defendants assert that excessive monitoring does not constitute an adverse employment action, and even if it did, Plaintiff has not shown that similarly situated white employees were not monitored to the same degree.  (Defs.' Memo. in Support of Motion for Summary Judgment, p. 32.)

As noted above, excessive monitoring and oversight of work ordinarily do not constitute adverse employment actions.  Fleming, 2006 WL 2709766, at *11.  However, "increased monitoring, in combination with an allegation that monitoring was selectively applied, could contribute to a finding that an adverse employment action has taken place." Deshpande v. Medisys Health Network Inc., No. 07-CV-375, 2008, WL 2004160, at *5

(E.D.N.Y. May 7, 2008).

Therefore, Plaintiff has the burden to establish that he was monitored more than similarly situated white employees.  Specifically, Plaintiff alleges: Jaworski recorded everything Plaintiff did in his "log book" in September 2005; Reiter recorded Plaintiff's actions in his notebook in November 2005; Sampsell authorized the installation of a surveillance camera in Plaintiff's booth without his knowledge in September 2006; and, Sampsell hired a private investigator to monitor Plaintiff and conduct a background check in March 2007.  (Pl.'s Memo. in Opposition to Motion for Summary Judgment, p. 51.)

Plaintiff has not shown how his employment was adversely impacted by any of this alleged monitoring, nor has he identified any similarly situated white co-workers who were treated differently.  In fact, the evidence is to the contrary.  For instance, Sampsell testified he hired a private investigation company, PBS Consultants, to install two hidden surveillance cameras to catch whoever was responsible for the graffiti and other harassing conduct.  (Sampsell Dec. ¶ 10.)  One of the cameras was placed inside the Process Operator booth.  (Id.)  The cameras ran continuously, meaning the one in the Process Operator booth recorded both Plaintiff and Daniel Ruger, a white Process Operator who manned the booth on a different shift.  (Id. ¶ 11.)  Therefore, there is no evidence to suggest white employees were treated more favorably in terms of surveillance.

Sampsell arranged for the same investigation company to place an undercover investigator in the Lackawanna Plant, again to discover who was responsible for the graffiti in and around the Pickler Department.  (Id. ¶ 25.)  The investigator started in the Plant on August 9, 2007 at 9:00 am but was spotted taking pictures by employees.  (Id. ¶ 27.)  In

addition to his cover being blown, the investigator took another job, so Sampsell discontinued the investigator's presence.  (Id.) The investigator did not report any improper conduct while he was there.  (Id.)

Plaintiff's conclusory statement that "no white employees were similarly monitored or had criminal background checks conducted on them" (Id.), is not sufficient to establish a *prima facie* case of discrimination. See Hill, 467 F.Supp.2d at 355 (Plaintiff "produced no evidence she received scrutiny in excess of other employees than her own perception that she was treated differently.").  Defendants' summary judgment motion for discrimination based on excessive monitoring is granted.

## C.      Hostile Work Environment

### 1.      Framework

Hostile work environment claims brought under § 1981 and the NYHRL  are analyzed under the same standard as Title VII claims.  Tomka v. Seiler Corp., 66 F.3d 1295, 1304 n.4 (2d Cir. 1995), *abrogated on other grounds by*, Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998) ( "New York courts require the same standard of proof for claims brought under the [NY]HRL as those brought under Title VII."); Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2nd Cir. 2000) (finding a hostile work environment claim under section 1981 is analyzed the same as a Title VII claim).  The Supreme Court has held that Title VII's protection extends beyond "economic" or "tangible" discrimination.  Harris v. Forklift Sys., 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L. Ed. 2d 295 (1993) (citing Meritor Savings Bank, FSV v. Vinson, 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed. 2d 49 (1986)).  Rather, Congress enacted Title VII to

"strike at the entire spectrum of disparate treatment of men and women in employment," and afford them the right to work in an environment free from discrimination, ridicule, and insult.  Harris, 510 U.S. at 21.

To survive a motion for summary judgment, a plaintiff claiming that he was the victim of a hostile work environment must produce evidence from which a reasonable trier of fact could conclude "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer."  Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003) (quoting Richardson v. New York State Dept. Of Correctional Service, 180 F.3d 426, 436 (2nd Cir. 1999).

### 2.      Plaintiff's Allegations

The incidents Plaintiff alleges make up his hostile work environment claim and the Company's response to those incidents are described below.

"Dancing Gorilla" Sign, "King Kong,"  "King Kong Lives," and "KK" Graffiti

On December 31, 2005, Plaintiff discovered a sign with the words "Dancing Gorilla" on the door of his work booth.  (Pl. Dep. 119:20-23, Dec. 18, 2007.)  On January 2, 2006, the words "King Kong" were spray painted on the side of a steel coil, "King Kong Lives" was spray painted on floor, and the letters "KK" were spray painted on the door of Plaintiff's work booth.  (Marchand Dec. ¶ 16.)

Shift Manager Bruce Marshall assured Marchand the "danging gorilla" sign was

removed and disposed of as soon as he found it.  (Marchand Dec. ¶ 17.)  The other graffiti was painted over after pictures were taken, and the steel coil was processed through the Pickler Department, removing any evidence of graffiti.  (Id. ¶ 18.)

On January 4, 2006, Marchand, Sampsell, and Jaworski held a mandatory meeting for all Pickler Department employees.  (Id. ¶ 19.)  The production line was shut down for 30 minutes during each shift meeting.  (Id.)  They explained that the graffiti could be interpreted as racist and that racism was strictly prohibited at the Plant and any violation of the policy would result in disciplinary action.  (Id. ¶ 20.)  When Pelc confessed to the graffiti, he was suspended for three days and warned that future conduct would result in further punishment.  (Id. ¶ 22.) However, James Hickey, an employee of the Lackawanna Plant, testified Pelc was permitted to work considerable overtime to offset any economic loss.  (Hickey Dec. ¶ 28.)

Sampsell states that the Plant asked Union President Anthony Fortunado to address the graffiti incident in the January 2006 newsletter, *Prime Line*.  (Sampsell Dec. ¶ 7.) Fortundado's article explained that the discriminatory graffiti would not be tolerated by the Union or management.  (Id.)

Multiple Death Threats

On February 9, 2006, Pelc screamed at Plaintiff, "when I see your black fucking ass on the outside I'm, going to fucking get you."  Pelc also called Plaintiff a "black mother fucker," "black bitch, and a "black piece of shit."  (Pl. Dep. 150-51, Dec. 18, 2007.)

Sampsell and Marchand state they interviewed every employee in the Pickler Department and everyone denied seeing or hearing the confrontation.  (Marchand Dec. ¶

33

24.)  Plaintiff states the investigation was not thorough because Marchand never questioned employee James Hickey (hereinafter, "Hickey"), the Union Grievance Chairman who talked to workers who heard the death threats and racial slurs.  (Marchand Dep. 103:13-16.)  Nonetheless, Pelc admitted telling Plaintiff he would "deal with him on the outside" and was disciplined for making a "veiled threat" by being suspended for 2 days without pay and receiving another written warning.  (Id. ¶ 26.)

After the incident, Sampsell suggested to Plaintiff he call the Employee Assistance Program (hereinafter, "EAP"), and Plaintiff agreed.  (Sampsell Dec. ¶ 8.)  Sampsell called EAP counselor Cindy Gross to inform her of the situation and connected her with Plaintiff. (Id.)

Plaintiff felt threatened by Pelc on other occasions and reported this to the Union on February 12, 2007.  (Marchnd Dec. ¶ 14.)  The Union informed Marchand and he and Hope spoke with Plaintiff about his concerns.  (Id.)  The meeting was conducted outside of the Pickler Department and Hickey accompanied Plaintiff.  (Id. ¶ 15.)  Plaintiff reported that Daley told him Pelc would kill Plaintiff if anything happened to him, two co-workers told him Pelc wanted to kill him, and Pelc and Reiter were plotting to cause him bodily harm. (Id.)  Plaintiff insisted Marchand not speak with Pelc and refused to identify the co-workers who told him Pelc wanted to kill him.  (Id. ¶ 16.)  Marchand spoke with Daley, who denied telling Plaintiff that Pelc had threatened him.  (Id. ¶ 17.)  Without any corroboration of Plaintiff's allegations, the investigation was concluded.  (Id. ¶ 18.)

"No Lazy People" Graffiti

In March 2006, the words "no lazy people" and "lazy" was spray painted in the

34

Pickler Department.  (Pl. Dec. ¶ 16.)

Marchand became aware of the  graffiti in June 2006.  (Marchand Dec. ¶ 29.)  He did not immediately investigate it, as it did not appear to be racially motivated.  (Id.)  However, the graffiti was removed the next day.  (Id.)  After Plaintiff filed his first charge with the NYSDHR, Marchand investigated the graffiti in December 2006.  (Id. ¶ 30.)  Only two employees admitted they had seen the graffiti and believed it was directed at Daniel Ruger, who shared Plaintiff's booth.  (Id. ¶ 31.)

After this incident, Marchand began walking around the Pickler Department to observe the work environment, spot any future graffiti, and deter future conduct.  (Id. ¶ 32.)  He directed Sampsell and Jaworski to do the same.  (Id.)

Communication with Pelc

On May 11, 2006 Plaintiff states he was forced by Jaworski to communicate with Pelc or he would be fired.  (Pl. Dep. 169:22-170:11, Dec. 18, 2007.)  Plaintiff was unaware of what Jaworski meant by "communicate with Pelc."  (Id. 170:22-23.)

Jaworski testified that he received reports that Plaintiff was not communicating with Pelc about changes in the sequence of steel coils being processed.  (Jaworski Dec. ¶ 10.)  Jaworski stressed that all employees on the Pickler line needed to communicate with each other so that everyone knows what coil is being processed.  (Id. ¶ 11.)  It is especially important for Pelc, the Recoiler Operator, to be aware of any changes in coil sequence so he can keep an accurate log of what has been processed.  (Id.)  Plaintiff told Jaworski and Marchand he announced coil changes over the radio, but Jaworski told him he needed to communicate directly with the appropriate co-workers, including Pelc, regarding whatever

35

the issue was.  (Id. ¶ 12.)

Greased Chair

On May 20, 2006, the chair in the Processor Operator booth was covered in black grease.  (Hickey Dec. ¶ 30.)

Marchand investigated the greased chair incident in August 2006.  (Marchand Dec. ¶¶ 27-28.)  He took a picture of the chair and interviewed thirteen employees, but no one had any information about the incident.  (Id. ¶ 28.)  Jaworski had the chair removed and a temporary chair was put in place immediately.  (Jaworski Dec. ¶ 3.)

"KKK" Graffiti

On July 25, 2006, someone wrote "KKK" on a wall in the Pickler Department. (Mathes Dec. ¶ 5.)

Sampsell did not think it was racially offensive and was not asked to investigate it. (Sampsell Dep. 116-117:2.)  Marchand investigated the "KKK" graffiti the same morning it was discovered.  (Marchand Dec. ¶ 33.)  The letters were painted over with black paint so they were no longer visible.  (Mathes Dec. ¶ 5.)  Five employees in the vicinity of the graffiti were interviewed, but no one had any information.  (Marchand Dec. ¶ 35.) After this incident, Marchand and Sampsell increased their surveillance of the Department by walking through more often.  (Id. ¶ 37.)  The incident was reinvestigated twice more in August 2006 and September 2006, but no new information was gathered.  (Id. ¶¶ 38, 39.)

On February 28, 2007, the letters "KKK" appeared in the same place as in July 2006.  (Pl. Dec. ¶ 20.)

36

Marchand investigated the graffiti and concluded it appeared to be the same letters as in July 2006 that had bled through the paint.  (Marchand Dec. ¶ 68.)  Nevertheless, Marchand performed an investigation.  (Marchand Dec. ¶ 69.)  Everyone in the Pickler denied knowing anything about the graffiti.  (Id.)

On May 23, 2007, Marchand met with each Pickler Department employee individually to reiterate that harassment and retaliation would not be tolerated in the Lackawanna Plant.  (Id. ¶ 71.)  He also asked each employee to report any graffiti or other inappropriate conduct they observed. (Id.)

Bathroom Breaks

Since July 2006, James Reiter, a white Senior Operating Technician in the Pickler Department, has refused to relieve Plaintiff for bathroom breaks.  (Marchand Dec. ¶ 72.)

Marchand and Jaworski investigated Plaintiff's complaints.  (Marchand Dec. ¶ 72; Jaworski Dec. ¶ 54)  Reiter told Marchand and Jaworski he stopped relieving Plaintiff because he would be gone for up to a half an hour and believed he was being taken advantage of.  (Marchand Dec. ¶ 73; Jaworski Dec. ¶ 5.)  Marchand testified employees are not required to relieve another employee for a bathroom break and there was no basis to discipline Reiter.  (Marchand Dec. ¶ 75.)  Jaworski asked Roy Cofield, an African American, to relieve plaintiff whenever possible.  (Jaworski Dec. ¶ 6.)

Alertline Complaint

On August 3, 2006, Plaintiff filed an Alertline compliant regarding the harassment and racial slurs, including being called "nigger," "monkey," "gorilla," and "boy" by his co-

workers.  (Biltekoff Dec. Ex. Y.)

The Alertline complaint was forwarded to Marchand.  (Marchand Dec. ¶ 43.)  He investigated any complaints that he had not already investigated.  (Id.)  For example, Marchand met with all employees on Plaintiff's crew to ask them about the names Plaintiff alleged he was called.  (Id.)  One employee admitted he referred to Plaintiff as a "big gorilla" in jest and Plaintiff never objected.  (Id. ¶ 44.)  All of the other employees denied calling Plaintiff any names.  (Id.)

Confidential E-mail

On August 5, 2005, Operations Manager Carl Pfeifer sent a confidential e-mail to Marchand and Sampsell discussing Plaintiff's irrational behavior and how to address the situation.  (Biltekoff Dec., Ex. Z.)

Name Crossed out on Time Sheets

In September 2006, Plaintiff complained to Marchand that his name was crossed out on blank time sheets, and that his pay was not always what it should have been.  (Pl. Dep. 149, Dec. 18, 2007.)

Marchand investigated the time sheet incident, but found no indication of who was responsible, when the conduct occurred, or that it was related to Plaintiff's race. (Marchand Dec. ¶ 46.)  Jaworski agreed to have the shift managers monitor the Department more closely.  (Id. ¶ 48.)

Confrontation with Daley

In September 2006, Kevin Daley, a white Senior Operating Technician, told Plaintiff

to "stop whining and crying like a bitch."  (Pl. Dep. 220:16-18, Dec. 18, 2007.)

Marchand, Sampsell, and Hickey all witnessed the confrontation between Plaintiff and Daley in September 2006.  (Marchand Dec. ¶ 50.)  Neither was disciplined.  (Id. ¶ 51.)

Installation of Surveillance Cameras

In September 2006, Sampsell authorized the installation of cameras in the Pickler Department, one being aimed directly at Plaintiff in his work booth.  (Pl. Dep. 252:4-9, Dec. 18, 2007.)

Sampsell testified the camera was placed inside the Process Operator booth to catch the person responsible for the graffiti and other harassing conduct.  (Sampsell Dec. ¶ 10.)  The camera ran continuously, meaning it recorded both Plaintiff and Daniel Ruger who manned the booth on opposite shifts.  (Id. ¶ 11.)  The recording was never reviewed because no incidents were reported while the camera was in operation.  (Id. ¶ 12.)

"Cry Baby" Harassment

On November 28, 2006, a co-worker verbally assaulted Plaintiff, calling him a "cry baby bitch." (Pl Dep. 261:11-12, Dec. 18, 2007.)  The co-worker received a verbal warning. (Pyanowski Dep. 45:4-6.)

Brown Face with Tears Graffiti

On December 19, 2006, a brown face with tears was spray painted on the wall across from Plaintiff's work booth.  (Pl. Dep. 159:15-18, Dec. 18, 2007.)

Marchand and Sampsell were notified of the graffiti that same day.  (Marchand Dec. ¶ 54.)  They both viewed it and interviewed Plaintiff and the other employees working that

shift.  (Id.)  The graffiti was removed the same day.  (Id. ¶ 55.)  Their investigation of the remaining employees in the Department continued, and they concluded there was nothing to indicate it was racially related or directed at Plaintiff.  (Id. ¶ 58.)

On December 20, 2006, Plaintiff informed Marchand he would no longer participate in any investigation without his lawyer present.  (Id. ¶ 59.)

<u>Backed Out Coil Incident</u>

On January 29, 2007, Pelc backed a coil out of the process line, causing additional work for Plaintiff.   (Pl. Dep. 189:11-13, Dec. 18, 2007.)

Marchand interviewed Plaintiff and Pelc immediately after the incident.  (Id. ¶¶ 60-62.)  Pelc stated Plaintiff said to him, "If it happens again, you and me are going to have trouble." (Id. ¶ 63.) Marchand investigated the incident over the next several days and the employees reported hearing Plaintiff say the same thing.  (Id. ¶ 64.)  Marchand found no evidence Pelc backed out the coil on purpose, and disciplined Plaintiff for his "veiled threat" against Pelc.  (Id. ¶ 65.)  Plaintiff was sent home for five hours without pay and suspended the next day without pay.  (Id.)

<u>Cell Phone Use</u>

On March 1, 2007, Plaintiff was restricted from using his cell phone at work by Sampsell.   (Pl. Dec. ¶ 21.)

Sampsell testified that Paragraph 23 of the Plant Rules and Regulation prohibits employees from using cell phones while operating any machinery or on Plant property, except for an emergency or during lunch in designated areas.  (Sampsell Dec. ¶ 50.)

Sampsell learned that Plaintiff was using his cell phone to make calls to other employees in the Plant.  (Id. ¶ 51.)  Therefore, he informed Plaintiff he had to communicate with his co-workers appropriately through the radio for work-related matters.  (Id.)  He did not tell Plaintiff he could not use his cell phone on Company property at all.  (Id.)  Plaintiff was not disciplined for using his cell phone in the Plant or on Company property.  (Id. ¶ 53.)

<u>Plaintiff's Vehicle Vandalized</u>

On February 2, 2006 and April 28, 2006, Plaintiff's vehicle was vandalized in the company lot.  (Sampsell Dec. ¶ 19.)

Sampsell did not investigate Plaintiff's complaint that his vehicle had been scratched in the company parking lot, per company policy.  (Id. ¶¶ 19-20.)  It was the policy of the Lackawanna Plant not to investigate damage to employee vehicles in the parking lot unless the damage was caused by a Company vehicle driven by an employee in the course of his/her duties.  (Id. ¶ 20.)  This is because the Plant is only responsible for damage to vehicles caused by another employee driving a Company vehicle.  (Id.)  Sampsell testified he applied the policy equally, including not investigating when his own vehicle was damaged in the Plant parking lot.  (Id. ¶ 21.)

The only times Sampsell investigated any report of a damaged car were on October 15, 2006 and December 3, 2007.  (Id.)  Sampsell reviewed surveillance camera footage after Plaintiff complained his car was vandalized on October 15, 2006.  (Id. ¶ 22.)  However, Plaintiff's car was outside the view of the camera because he parked in a non-designated parking area.  (Id. ¶ 24.)  Sampsell suggested he park in the designated lot in the future so his car would be monitored by the camera.  (Id.)

Stuffed Toy Monkey with Noose

On December 3, 2007, a stuffed toy monkey was strapped to the side mirror of Plaintiff's vehicle with a rope around its neck.  (Pl. Dec. ¶ 27.)

Nevin Hope (hereinafter, "Hope"), who had replaced Marchand as Human Resources Manager after he retired, investigated the incident.  (Hope Dec. ¶ 3.)  Plaintiff told Hope he was upset and was allowed to leave work for the rest of the day.  (Id.)  Hope met with all of the employees in the Pickler Department individually, asking when they arrived to work, if they left their workstation at any time, and whether they saw anyone approach Plaintiff's car that day.  (Id. ¶ 5.)  He also distributed a copy of the Plant policies prohibiting harassment and discrimination including, the EEO policy, Article Four of the CBA, the Plant Rules and Regulations, and the Workplace Violence and Harassment Policy.  (Id. ¶ 6.)

This was the second time Sampsell agreed to investigate Plaintiff's complaints relating to his car.  (Sampsell Dec. ¶ 28.)  Sampsell reviewed the surveillance camera footage, but could not see anything because Plaintiff again parked in an un-designated parking area.  (Id. ¶ 29.)  The Company also hired an attorney to investigate, but he was unable to conclude who was responsible.  (Biltekoff Dec., Ex. JJ.)  The Lackawanna Plant installed another surveillance camera for the specific purpose of monitoring the area where Plaintiff preferred to park his car.  (Hope Dec. ¶ 9.)

Broken Recoiler Chair

On June 5, 2008, Pelc broke the chair in the Recoiler booth to prevent Plaintiff from sitting his "black ass" in it.  (Pl. Dep. 55, July 2, 2008; Drayton Aff. ¶ 31.)  Plaintiff reported

this to Hope.  (Pl. Dep. 56:12-13, July 2, 2008.)  Hope concluded the chair was already broken, and because it was Pelc's personal property he had the right to dispose of it. (Hope Dec., Ex. H.)

Tennis Ball with Sound

In June 2008, a co-worker found a tennis ball in the Pickler Department office with a sound device that made monkey sounds when shaken.  (Pl. Dec. ¶ 28.)  Hope investigated and found no evidence the sound the tennis ball produced was that of a monkey.  (Hope Dec., Ex. I.)

Graffiti in Front of Plaintiff's Car

In October 2008, Plaintiff discovered threatening graffiti sprayed on a window in front of where his car was parked that said, "your wife sucks" with the word "wife" crossed out and replaced with "daughter."  (Pl. Dec. ¶ 34.)  Hope concluded the graffiti was not directed at Plaintiff nor racially motivated.  (Pl. Dec., Ex. I.)

Graffiti in Pickler Department of "Ape-Man"

In October 2008 more racial graffiti was discovered on a railroad car parked inside the Pickler Department depicting an "ape-man."  (Pl. Dec. ¶ 35.)  Hope investigated and concluded there was no evidence the drawing was either racially motivated or directed at Plaintiff.  (Pl. Dec., Ex. I.)

### 3.    Existence of Hostile Work Environment.

Defendants contend that most of the incidents Plaintiff alleges were not based on his race and therefore cannot be considered part of his hostile work environment claim.

(Defs.' Memo. in Support of Motion for Summary Judgment, p. 7.)  Nevertheless, they concede that the incidents they believe relate to race are sufficient to constitute a hostile work environment.  (Id.)

Plaintiff argues that all of the alleged incidents should be considered in the hostile work environment analysis because the court is to look to the totality of the circumstances when analyzing the claim.  (Pl.'s Memo. in Opposition to Motion for Summary Judgment, p. 8.)  Furthermore, none of these incidents are contested as untimely.  (Id.)

The Supreme Court explained, "incidents comprising a hostile work environment are part of one unlawful employment practice," and therefore, "the employer may be liable for all acts that are part of the single claim." Nat'l RR. Passenger Corporation v. Morgan, 536 U.S. 101, 118, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).  Since Defendants have agreed that a hostile work environment exists, the court "should not carve the work environment into a series of discrete incidents and then measure the harm occurring in each episode." Burns v. McGregor Elec. Indus., Inc., 955 F.2d 559, 564 (8th Cir. 1992).  "At the summary judgment stage, the district court must assume that all of plaintiff's allegations pertaining to the issue of a hostile work environment are true." E.E.O.C. v. Thomas Dodge Corp., No. 07-CV-988 2009 WL 803150 at * 6 (E.D.N.Y. Mar. 25, 2009).

### 4.    Employer Liability

#### a.    Liability for Non-Supervisory Employees

An employer is subject to liability when a hostile work environment is created by non-supervisory co-workers where the plaintiff can show that the employer knew or reasonably should have known about the harassment and failed to take appropriate action,

or that the employer provided no reasonable avenue for complaint.  <u>Richardson</u>, 180 F.3d at 441.  Of the 22 incidents of which Plaintiff complains, 18 were alleged to have been committed by co-workers rather than supervisors.  There is no dispute that Defendants knew about the alleged harassment.

Plaintiff argues that Defendants failed to provide an efficient complaint procedure and failed to educate their employees on workplace discrimination and harassment.  (Pl.'s Memo. in Opposition to Motion for Summary Judgment, p. 33.)  He notes that the CBA provides protection for Union employees by mandating that a Civil Rights Committee be established to "review and investigate matters involving civil rights and attempts to resolve them."  (Id. at p.29; CBA pp.24, Article Four, Section (B)(2).)  Plaintiff asserts he tried to file a grievance on two occasions in September 2005, but Sampsell refused to accept them, claiming there was no provision in the CBA for discrimination complaints and that the Plant did not have a Civil Rights Committee.  (Hickey Dep. 20:1-6.)  It is true that the Plant did not have such a Committee at the time, and one was not created until December 2006.  (Marchand Dep. 53:18-20.)  Once the Committee was established, its members did not receive training on civil rights matters, or harassment and discrimination until May 7, 2007.  (Id. 59:1-5.)

Furthermore, the CBA provides that "[a]ll employees shall be educated in the area of harassment awareness and prevention on a periodic basis."  (Hickey Dec., Ex. A, CBA Art. Four, Section (C)(1).)  Plaintiff contends that no such training existed until October 2007, two years after his complaints began.  (Sampsell Dep. 60:1-15.)  Plaintiff notes the Company does not have any signed acknowledgments that prove the employees actually

45

attended and/or understood the workplace discrimination and harassment training.  (Pl.'s Memo. in Opposition to Summary Judgment, p. 32.)  Nor does it have proof that the employees read or understood the EEOC or Company policies that were allegedly handed out and mailed to their homes at various times.  (Id.)

Defendants contend the Lackawanna Plant has had multiple policies in place prohibiting harassment and discrimination.   (Defs.' Memo. in Support of Summary Judgment, p. 12.)   For instance, the CBA contains an express provision prohibiting discrimination and harassment on account of race.  (Marchand Dec., Ex. A, CBA, Art. Four, Section (A).)  The Lackawanna Plant also has its own Plant Rules and Regulations, which prohibit harassment as well as intimidation or threats towards other employees.  (Fortunato Dec., Ex. A.)  A copy of the Plant Rules was mailed to the homes of hourly employees represented by the Union on June 30, 2003, September 27, 2004, August 18, 2006, March 1, 2007, and August 1, 2008.  (Fortunato Dec. ¶ 3; Marchand Dec. ¶¶ 8-12, Ex. E, F, G, H.)  These rules did not change when the Company was purchased in 2005.  (Marchand Dec., Ex. G.)  However, they were updated and revised in 2007 to add a separate Workplace Violence and Harassment Policy.  (Id., Ex. X.)  The Rules were revised again in 2008 to restrict the use of plant radio transmissions to business purposes only.  (Fortunato Dec., Ex. A.)

Moreover, the Plant issued and posted updated copies of the Equal Employment Opportunity and Affirmative Action policy every January throughout the entrances and hallways.  (Marchand Dec. ¶¶ 6-7, Ex. B, C.)  Since January 2005, the Plant has posted a multi-law poster issued by the U.S. Department of Labor notifying employees of their Title

46

VII rights.  (Marchand Dec. ¶ 15, Ex. J.)  And, in March 2005, a Fair and Equal Treatment Policy was issued to all employees at the Lackawanna Plant not represented by the Union, notifying them of the discrimination and harassment policies.  (Marchand Dec. ¶¶ 13-14.)

Defendants contend that several of Plaintiff's co-workers testified they were aware of the Plant's policy against discrimination and harassment and had received the Plant Rules and Regulations, including Drayton, Hertel, and Daley.  (Defs.' Reply Memo., p. 8.) They also assert the fact that Plaintiff was unable to file his grievance is not material to their motion.  (Id.)  They note that despite the lack of a formal grievance procedure, Plaintiff did have an avenue for complaint.  (Id. p.9.)  He reported all of the alleged harassment and each incident was investigated.  (Id.)

Defendants do not deny that they were aware of Plaintiff's claims of harassment, but aver they acted reasonably in response to Plaintiff's complaints by promptly investigating each complaint that related to his race and imposing discipline where appropriate.  (Defs.' Memo. in Support of Motion for Summary Judgment, p. 13.)  They also assert that the Plant took steps to prevent future acts of harassment.  (Id. at p. 19.) Defendants' actions in relation to each alleged incident of harassment are described above.

Plaintiff states Defendants failed to take prompt and reasonable action to prevent and stop the racial harassment.  He contends Defendants made "no discernable efforts to identify, discipline, or educate those responsible for the racism." (Pl.'s Memo in Opposition to Summary Judgment, p. 28.)  Although this position is extreme, as there is evidence Defendants conducted investigations into Plaintiff's complaints, there is a question of fact

as to whether Defendants' actions were adequate.  For instance, even when Pelc was identified twice as the harasser, he was allowed to continue to work closely with Plaintiff. Pelc remained on Plaintiff's crew in the Pickler Department and, at times, even worked the same shift as him until he voluntarily transferred off Plaintiff's shift in October 2006.  (Pelc Dep. 71:21-23; Marchand Dec. ¶ 61.)   Defendants' knowledge of Pelc's persistent harassment creates an issue of fact as to the reasonableness of defendants' efforts and the effectiveness of the remedy.  See Powell v. Consol. Edison Co. of N.Y., No. 97 Civ. 2439, 2001 WL 262583, at * 16 (S.D.N.Y. Mar. 13, 2001) (overall effectiveness of remedy is a jury question).  Furthermore, if an investigation was done it was not always prompt. For example, an investigation into the "No Lazy People" graffiti in June 2006 was not completed until October 2007.  (Marchand Dep. 132-133.)

Although success is not imperative in showing an employer demonstrated reasonable care in correcting harassing conduct, it is one factor that a court may consider. Whidbee, 223 F.3d at 72.  The fact that harassment continued into 2008 despite Plaintiff's numerous complaints leaves reasonable jurors free to conclude that the defendants' response was inadequate. See Richardson, 180 F.3d at 442.

Where "the evidence creates an issue of fact as to whether an employer's action is effectively remedial and prompt, summary judgment is inappropriate." Whidbee, 223 F.3d at 73.  Given the disputed facts concerning whether the Company exercised reasonable care to prevent and promptly correct the harassing behavior after being notified by Plaintiff, summary judgment is denied.

48

### b.    Vicarious Liability for Supervisory Employees

An employer is also subject to liability when a hostile work environment is "created by a supervisor with immediate (or successively higher) authority over the employee." Burlington Indus. Inc. v. Ellerth, 524 U.S. 742, 756, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); Faragher v. City of Boca Raton, 524 U.S. 765, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).  An employee is considered supervisory if he or she has "the authority to affect the terms and conditions of the victim's employment."  Mack, 326 F.3d at 126 (quoting Parkins v. Civil Constructors of Illinois, Inc., 163 F.3d 1027 (7th Cir. 1998)).  This authority is interpreted broadly to include more than "the power to hire, fire, demote, promote, transfer, or discipline."  Id.  Out of the twenty-two incidents alleged by Plaintiff, only four were alleged to have been committed by supervisors.

Defendants do not dispute that Sampsell, Marchand, and Jaworski were in a supervisory position.  Therefore, the conduct of Plaintiff's individual supervisors is imputed to the Plant.

However, when no tangible employment action is taken, such as here, the employer may raise an affirmative defense to liability.[8]  Faragher, 524 U.S. at 807-08; Ellerth, 524 U.S. at 765.  The *Faragher/Ellerth* defense is raised by showing: "(a) that the employer exercised reasonable care to prevent and correct promptly any [] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer to avoid harm otherwise."  Id. at 807.

---

[8]Plaintiff has not shown he was refused a promotion, fired, reassigned with significantly different responsibilities, or experienced a significant change in benefits.  Huaman v. American Airlines, Inc., No. 00 Civ. 6336, 2005 WL 2413189, at *2-3 (E.D.N.Y. Sept. 29, 2005) (citing Ellerth, 524 U.S. at 761).

The Second Circuit cautions that summary judgment should only be granted when "the evidence is so overwhelming that the jury could rationally reach no other result." Fairbrother v. Morrison, 412 F.3d 39, 53 (2nd Cir. 2005).

A defendant may attempt to satisfy the first element by showing an anti-harassment policy existed during the period of the plaintiff's employment, "although the fact alone is not always dispositive."   Ferraro v. Kellwood Co., 440 F.3d 96, 102 (2nd Cir. 2006).   As discussed above, Defendants had in place an anti-harassment policy during the relevant time period, and thus have satisfied the first element of the affirmative defense.

As to the second element of the defense, the employer must show that the "plaintiff completely failed to utilize the complaint procedures." Bennett v. Progressive Corp., 225 F.Supp.2d 190, 208 (N.D.N.Y. 2002) (citing Leopold v. Baccarat, Inc., 239 F.3d 243, 246 (2nd Cir. 2001)).  If the defendant satisfies this initial burden, "the burden of production shifts to the plaintiff to demonstrate a reason or reasons as to why such procedures were not utilized." Id.  The employer may then rely on the "absence or inadequacy of such proffered reason or reasons in carrying its ultimate burden of persuasion." Id.

Defendants contend that although Plaintiff complained about the harassment, he withheld relevant information on numerous occasions.  (Defs.' Memo in Support of Summary Judgment, p. 22.)  For instance, although Plaintiff knew Pelc was responsible for the "Dancing Gorilla" sign and "King Kong" graffiti within hours of both events, he never provided that information to the Lackawanna Plant.  (Pl. Dep. 125-27.)  Similarly, Plaintiff did not identify the co-workers who made the racial slurs he reported in his Alertline complaint and did not identify who told him Pelc threatened to kill him in February 2007.

50

(Marchand Dec. ¶ 16; Ex. S.)

Summary judgment is denied as to this claim, given Defendants' failure to satisfy their burden of proving the second element of the affirmative defense.  It is undisputed that Plaintiff made complaints to various people in the Union and the Plant, attempted to file grievances, and even made an Alertline complaint.  Therefore, he availed himself of all possible avenues for complaint and Defendants do not argue otherwise.  See Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 104 (2nd Cir. 2010) (A genuine issue of fact may be raised as to whether it was reasonable or not for a plaintiff to pursue other avenues of complaint.).

In sum, summary judgment on Plaintiff's hostile work environment claim is denied as to employer liability.

### 5.     Individual Liability

It is undisputed that Defendants cannot be held personally liable under Title VII. Schiano v. Quality Payroll Sys., 445 F.3d 597, 608 (2nd Cir. 2006).  However, individuals may be held liable under the NYHRL and § 1981 in certain circumstances.

Plaintiff alleges that Sampsell, Jaworski, and Marchand should all be held individually liable for participating in the discriminatory activity against him.  (Pl.'s Memo in Opposition to Motion for Summary Judgment, pp. 60-61.)  Specifically, Plaintiff alleges Sampsell refused to accept his initial complaints of discrimination and harassment, threatened that he did not want outside agencies coming to the Plant to investigate his complaints, failed to investigate complaints, secretly monitored him, and penalized him for attending depositions in this lawsuit.  (Id. p. 61.)  Plaintiff further alleges that Marchand

failed to provide effective workplace policies and training, failed to investigate his Alertline complaint, and conducted ineffective investigations.  (Id.)  Lastly, he alleges Jaworski excessively monitored him and threatened to fire him if he did not communicate directly with Pelc.  (Id.)

      **a.**    **NYHRL**

An individual may be held liable under a theory of aiding and abetting pursuant to Section 296 (6) of the NYHRL, which makes it "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under [the NYHRL], or to attempt to do so."  See Tomka, 66 F.3d at 1317; see also, Glinski v. RadioShack, 03-CV-930, 2006 U.S. Dist. LEXIS 71707, at * (W.D.N.Y. Sept. 29, 2006). This basis for personal liability turns on whether the individual actually participated in the conduct giving rise to the discrimination claim.  "To 'actually participate' in discrimination, however, an individual employee need not himself take part in the primary violation." Ahmed v. Compass Group, No. 99 Civ. 10032, 2000 WL 1072299, at *5 (S.D.N.Y. August 3, 2000) (quoting Lewis v. Triborough Bridge and Tunnel Auth., 77 F.Supp.2d 376, 380-81 (S.D.N.Y. 1999)).  "A supervisor's failure to take adequate remedial measures can rise to the level of 'actual participation.'"  Id. at 384.

    Plaintiff urges that the individual defendants failed to take remedial measures and thus each participated in the creation of a hostile work environment as identified above. Defendants argue there is no evidence to suggest Marchand, Sampsell, or Jaworski actively participated in the alleged co-worker harassment.  (Defs.' Memo. in Support of Motion for Summary Judgment, p. 27.)

Based upon the individual defendants' involvement, as described above, and the question of fact regarding whether there were adequate measure taken to combat the harassment, the Court finds Plaintiff has alleged enough for a reasonable jury to find that Marchand, Sampsell, and Jaworski actively participated in the alleged co-worker harassment under the NYHRL.

### b.    § 1981

Section 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 224 (2nd Cir. 2004). "In order to make out a claim for individual liability under § 1981, a plaintiff must demonstrate 'some affirmative link to causally connect the actor with the discriminatory action.'" Whidbee, 223 F.3d at 75 (quoting Allen v. Denver Public School Bd., 928 F.2d 978, 983 (10th Cir. 1991)). This is accomplished by showing that an actor is personally involved in the discriminatory activity. Hicks v. IBM, 44 F.Supp.2d 593, 597 (S.D.N.Y. 1999). Whidbee, 223 F.3d at 75 (Mere negligence "dose not constitute the 'personal involvement' or 'affirmative link' necessary to support a claim of individual liability."). Personal involvement includes: (1) direct participation; (2) failure to remedy the wrong after learning of it; (3) creation of a policy or custom under which unconstitutional practices occurred; and (4) gross negligence in managing subordinates. Black v. Coughlin, 76 F.3d 72, 74 (2nd Cir. 1996).

Plaintiff alleges the Lackawanna Plant fostered a corporate culture that encourages, accepts, and condones racial discrimination and harassment. (Pl.'s Memo in Opposition to Motion for Summary Judgment, p. 3.) Defendants argue that there is no evidence to

53

suggest Marchand, Sampsell, or Jaworski directly participated in the alleged co-worker harassment.  (Defs.' Memo. in Support of Motion for Summary Judgment, p. 25.)  They also argue that they could not be found grossly negligent in supervising subordinates, given the policies in place and their investigations of Plaintiff's complaints.  (Id.)

Because there is a question as to whether the Defendants' failure, as supervisory employees, to stop or at least curb the harassing conduct against Plaintiff created a culture that accepted discrimination and harassment, a rational jury may find, in the very least, the creation of a custom under which unconstitutional practices occurred.

\*        \*        \*

Therefore, Defendants' motion for summary judgment on Plaintiff's claim of harassment regarding the individual defendants is denied.

## D.    Retaliation

Retaliation claims under Title VII, § 1981, and the NYHRL are analyzed under the McDonnell-Douglas burden-shifting analysis.  Richardson, 180 F.3d at 443.  The allocation of burdens of proof in retaliation claims parallels that of discrimination claims.  Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996) (citations omitted).  However, the elements of a *prima facie* case for retaliation differ somewhat.  To prevail on a retaliation claim, the plaintiff must show that (1) he participated in a protected activity, (2) his participation was known to the defendant, (3) he suffered an adverse employment action, and (4) a causal connection exists between the protected activity and the adverse employment action.  Richardson, 180 F.3d at 443; Jones v. Smithkline Beecham Corp., 309 F.Supp.2d 33, 356 (N.D.N.Y. 2004).  There is no question that Plaintiff engaged in

54

protected activity by complaining about purported discrimination and harassment, and that Defendants were aware of his complaints at the time of the alleged instances of retaliation. However, Defendants argue that Plaintiff cannot satisfy the third and fourth elements of his *prima facie* case.

Plaintiff alleges several retaliatory acts against him by Defendants, including:

> 1.   On September 23, 2005, Jaworski began monitoring everything Plaintiff did in his "log book." (Biltekoff Dec., Ex. S.) In November 2005, Reiter, a production line Supervisor, also began keeping a detailed notebook on Plaintiff and reported to Jaworski. (Biltekoff Dec., Ex. T.)

> 2.   In January 2006, Jaworski approached Roy Cofield, an African American employee, and offered him "anything he wanted or needed" to get Turley to "simmer down."  (Cofield Aff. ¶ 13.)

> 3.  On January 4, 2006, Sampson told the Pickler Department employees he did not want outside agencies coming into the Lackawanna Plant to investigate the January 2, 2006 King Kong graffiti incident.  (Pl. Dec. ¶ 12.)

> 4.   On August 5, 2006, Pfeifer sent a confidential e-mail to Sampsell, Marchand, and Richardson stating, in part, "[h]is actions have become a constant disruption in the workplace... he has filed a complaint with the NYSDHR and is working with an attorney... we cannot let those actions stop us from protecting our employees and our business." (Biltekoff Dec., Ex. Z.)

> 5.  In September 2006, Sampsell authorized the installation of cameras in the Pickler Department, one being aimed directly at Plaintiff in his work booth.  (Pl. Dep. 252:4-9, Dec. 18, 2007.)

> 6.  In March 2007, Defendants hired a private investigator to monitor the Pickler Department. (Pl.'s Memo. in Opposition to

Motion for Summary Judgment, p. 51.)

7.  Plaintiff was told he would be charged with an unexcused absence if he attended Sampsell's deposition on November 20, 2007.  (Id. 5-6.)

8.  On November 30, 2007, Plaintiff requested to be off work on December 5, 2007 to attend mediation in this case, but was denied an excused absence.  (Id. 6:19-21.)

The scope of Title VII's retaliation provision is broader than that of Title VII's substantive discrimination provision.  The third element is not limited to an employer's actions that affect terms, conditions, status of employment, or those that occur at the workplace.  Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 62, 126 S.Ct. 2405, 2411-12 (U.S. 2006).  Rather, the question is whether a reasonable employee would be dissuaded from engaging in protected conduct.  Id. at 77, 126 S.Ct. 2405.

For the most part, Plaintiff has not put forth any evidence to raise a genuine issue of fact as to whether these alleged actions caused a materially adverse change in the terms and conditions of his employment.  Being monitored at work, the existence of confidential management e-mails, the installation of surveillance cameras and private investigators, and innocuous statements from a manager that Plaintiff needed to "simmer down" or that he did not want outside agencies having to investigate the alleged racism are not instances that would dissuade a reasonable employee from engaging in protected conduct.

Furthermore, threats of termination or other punishment do not qualify as adverse actions where they were never carried through.  In regards to the threat of an unexcused

absence for attending Sampsell's deposition, the absence was never counted as such.  In addition, Defendants state a legitimate, non-discriminatory reason for telling Plaintiff his anticipated absence for attending the deposition would be marked as unauthorized, namely that Plaintiff failed to comply with the Absence and Leave policy by not asking for time off by the preceding Wednesday.  (Defs.' Memo. in Support of Motion for Summary Judgment, pp. 56-57.)   Nevertheless, the fact that the Company allowed Plaintiff to attend the deposition and did not charge him with an absence negates any pretext alleged by Plaintiff.

In regards to the threat of suspension in retaliation for attending Sampsell's deposition, Plaintiff alleged the Company falsified his time records to show he was late to work on November 5, 2007.  When Plaintiff complained of this, the suspension was never imposed.  Furthermore, there is no causal connection where the date that he was alleged to have come in late was fifteen days *before* Sampsell's deposition.  Plaintiff has failed to establish a *prima facie* case as to this allegation of retaliation.

In regards to the threat of termination for attending mediation, Plaintiff did not suffer an adverse employment action as he was later told he would not be charged with an absence.   Moreover, Defendants state a legitimate, non-discriminatory reason for threatening him.   They explain that Plaintiff's absence was going to be considered unexcused because he had not requested the time off in accordance with the Absence and Leave Policy.

Thus, Plaintiff has failed to establish the third element of his *prima facie* case, and summary judgment is granted as to Plaintiff's retaliation claim.

**E.     Intentional Infliction of Emotional Distress**

To establish a *prima facie* case of intentional infliction of emotional distress under

New York Law, a plaintiff must prove the following elements:

> (1)    extreme and outrageous conduct;
> (2)    intent to cause, or reckless disregard of a substantial probability of causing severe emotional distress;
> (3)    causal connection between the conduct and injury; and
> (4)    severe emotional distress.

Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir. 1999) (citing Howell v. New York Post Co.,

Inc., 81 N.Y.2d 115, 121, 612 N.E.2d 699 (1993)); see also Walker v. New York City

Transit Auth., No. 99 CIV. 3337(DC), 2001 WL 1098022 (S.D.N.Y. Sept. 19, 2001).

Liability can be found only where the conduct alleged is "so outrageous in character, and

so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded

as atrocious and utterly intolerable in a civilized community." Howell, 81 N.Y.2d at 122; see

also Murphy v. Am. Home Prods. Corp., 448 N.E.2d 86, 58 N.Y.2d 293 (1983).

The New York Court of Appeals has rarely allowed a plaintiff to sustain a claim for

intentional infliction of emotional distress in an employment discrimination case. Ahmed,

2000 WL 1072299, at *10.  In addition, New York courts have made it clear that the "use

of religious, ethnic, or racial aspersions to denigrate a person... is not sufficiently egregious

conduct to state a claim" of intentional infliction of emotional distress. Graham ex rel.

Graham v. Guilderland Cent. School Dist., 256 A.D.2d 863, 863, 681 N.Y.S.2d 831, 832

(3rd Dept. 1998).  However, Plaintiffs claims involve not only racial discrimination but also

verbal abuse, harassment, and death threats. See Flamm v. Van Nierop, 56 Misc.2d 1059,

1060, 291 N.Y.S.2d 189, 190-91 (1968) (recurring physical threats and harassing phone calls amounted to a claim of intentional infliction of emotional distress).  These death threats are not "acts which merely constitute harassment, disrespectful or disparate treatment, a hostile work environment, humiliating criticism, intimidation, insults or other indignities."  Lydeate v. Bronx Overall Economic Development Corp., No. 00 Civ. 5433, 2001 WL 180055 at *2 (S.D.N.Y. February 22, 2001).

Plaintiff presents testimony of himself and treating physician that Defendants' conduct caused him to suffer emotional distress.  (Pl. Dec. ¶ 52.)  Defendants do not rebut this in any way.  For instance, Plaintiff alleges that his emotional distress was so severe he was forced to leave work and seek emergency medical attention on three separate occasions.  (Id. ¶ 51.)  As a result, Plaintiff has been diagnosed with severe anxiety, stress, panic attacks, depression, and Post Traumatic Stress Disorder.  (Id.)

Consequently, this Court finds, at a minimum, Plaintiff raises a disputed issue of material fact, and thus, this Court cannot conclude that Plaintiff's claim is precluded as a matter of law.  Defendants therefore are not entitled to summary judgment on Plaintiff's intentional infliction of emotional distress claim.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment on Plaintiff's discrimination claim is granted as to overtime, training, absence and leave, and monitoring, and denied as to unequal pay.  Defendants' motion for summary judgment on Plaintiff's hostile work environment claim is denied in its entirety.  Defendants' motion for summary judgment on Plaintiff's retaliation claim is granted.  Lastly, Defendants' motion for summary

judgment on Plaintiff's intentional infliction of emotional distress claim is denied.

In addition, Defendants' Motion to Strike is denied, and Plaintiff's Cross-Motion to Strike is denied.

## IV.  ORDERS

IT IS HEREBY ORDERED, that Defendants' Motion for Summary Judgment (Docket No. 27) is GRANTED, in part, and DENIED, in part.

FURTHER, that Defendants' Motion to Strike (Docket No. 92) is DENIED.

FURTHER, that Plaintiff's Cross-Motion to Strike (Docket No. 93) is DENIED.


SO ORDERED.


Dated:  March 23, 2011
         Buffalo, New York

                                        /s/William M. Skretny
                                        WILLIAM M. SKRETNY
                                              Chief Judge
                                        United States District Court