UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ELIJAH TURLEY,

                    Plaintiff,

                                                              **DECISION AND ORDER**
          v.                                                      06-CV-794S


ISG LACKAWANNA, INC.,
ISG LACKAWANNA, LLC,
MITTAL STEEL USA LACKAWANNA INC.,
MITTAL STEEL USA INC., d/b/a
ARCELOR-MITTAL STEEL,
LARRY D. SAMPSELL,
GERALD C. MARCHAND,
THOMAS JAWORSKI,

                    Defendants.

## TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III. DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.    Rule 50(b) & 59 Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B.    Defendants' Motion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        1.    Parent-Corporation Liability. . . . . . . . . . . . . . . . . . . . . . . . 10

        2.    Corporate & Individual Liability — Title VII, § 1981, and NYHRL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        3.    Intentional Infliction of Emotional Distress . . . . . . . . . . . 20

        4.    Verdict Form & Jury Charge . . . . . . . . . . . . . . . . . . . . . . . 24

        5.    Passion and Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        6.    Compensatory Damages . . . . . . . . . . . . . . . . . . . . . . . . . 27

        7.    Punitive Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

            a.    Degree of Reprehensibility . . . . . . . . . . . . . . . . . . 35

            b.    Ratio . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

            c.    Sanctions for Comparable Conduct . . . . . . . . . . . 39

    C.    Plaintiff's Motion for Attorney Fees . . . . . . . . . . . . . . . . . . . . . . . . . . 41

        1.    Attorney Rates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

2.      Time Expended . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

IV.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

V.  ORDERS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

# I. INTRODUCTION

After several weeks of trial in this employment-discrimination case, a properly-empaneled, eight-member jury returned a unanimous verdict in favor of the Plaintiff, Elijah Turley. The trial was bifurcated between liability and damages, and, at the close of the second installment, the same jury awarded Turley a total of $1,320,000 in compensatory damages and $24,005,000 in punitive damages.

Turley's former employer, his former supervisors there, and its parent company—the Defendants in this case—now move for judgment as a matter of law, or for a new trial under Federal Rules of Civil Procedure 50(b) and 59. Defendants argue that the evidence presented at trial does not support any part of the jury's verdict, including its finding that Arcelor Mittal USA Inc. ("AM USA")—the corporate parent—and its local subsidiary, ArccelorMIttal Lackawanna LLC, ("Lackawanna"), constituted a single employer.[1] Barring judgment as a matter of law or a new trial, they seek a reduction in the amount of

---

[1]Defendant was hired by a Buffalo-area steel plant formerly known as Bethlehem Steel. At all relevant times, however, the plant was owned by a different company. Those various corporate names, beginning with ISG Lackawanna Inc., and including parent and subsidiary relationships, were explained by this Court in an earlier Decision and Order:

> ISG Lackawanna Inc., a wholly-owned subsidiary of International Steel Group Inc., purchased the steel galvanizing operation at the former Bethlehem Steel Plant in Lackawanna, N.Y. in May 2003. In January 2004, ISG Lackawanna Inc. became ISG Lackawanna LLC, a Delaware limited liability company. In April 2005, Mittal Steel Co. purchased International Steel Group, Inc., the parent of ISG Lackawanna LLC and shortly thereafter changed the name to Mittal Steel USA Inc. In June 2006, Mittal Steel Co. and Arcelor merged to create ArcelorMittal Inc. Shortly thereafter the name Mittal Steel USA Inc. was changed to Arcelor Mittal USA Inc. ISG Lackawanna LLC was then a wholly-owned subsidiary of ArcelorMittal USA Inc. and changed its name to ArcelorMittal Lackawanna LLC.

Turley v. ISG Lackawanna, Inc., 803 F. Supp. 2d 217, 227–28 (W.D.N.Y. 2011) (citations omitted). The parties stipulated that ISG Lackawanna, Inc., ISG Lackawanna, LLC, and ArccelorMIttal Lackawanna LLC, (collectively "Lackawanna") were Turley's employers. No stipulation was entered regarding the parent company, Arcelor Mittal USA Inc.

damages.

Turley opposes Defendants' motion and moves separately for attorney fees.

For the following reasons, Defendants' motion is denied, except on punitive damages, which will be reduced; Plaintiff's motion is granted, but with a reduction in the amount of recoverable attorney fees.

## II.  BACKGROUND

### A.    Facts

Elijah Turley was a steel worker. He started in 1995, when he was hired by the Buffalo-area plant, Bethlehem Steel. He was employed there when ISG Lackawanna Inc. purchased the plant from Bethlehem Steel in 2003, and remained employed through AM USA's purchase in 2005. He was finally laid off when the plant closed in April of 2009.

Elijah Turley is also black. He was, in fact, the only African-American in Lackawanna's Pickler Department—the processing area of the plant where Turley worked. (3 Tr. 21.) And the testimony at trial unequivocally demonstrated that, beginning in 2003, he was subjected to loathsome racial harassment at work. An illustration of that follows.

Defendant Thomas Jaworski, one of Turley's supervisors, repeatedly called him "boy." (3 Tr. 4, 6.) Co-workers refused to eat lunch him; they called him a monkey, a boon, an ape, a gorilla; they called him a nigger, or worse yet, "that fucking nigger." (See, e.g., 2 Tr. 66, 2 Tr. 186, 3 Tr. 73.)

Regrettably, the disparaging treatment was not limited to offensive name calling. His workstation, for instance, was also targeted. A "dancing gorilla" sign was hung there; the letters "KK," an apparent reference to King Kong, were spray-painted on the nearest door to his workstation; the phrase "King Kong lives" was spray-painted not just on a nearby coil

2

but also on a nearby floor plate.

Co-worker Frank Pelc's conduct was particularly egregious. He admitted that he spray-painted graffiti with messages directed at Turley. And at one point he confronted Turley, screaming at him, "You fucking black bitch, you fucking black piece of shit." (3 Tr. 26.) He made monkey sounds and threatened Turley's life: "When I see your black nigger ass on the outside, I'm going to fucking shoot you." (3 Tr. 28.) After this incident Turley was visibly traumatized, and was taken to the hospital.

Other co-workers also confronted Turley. At one point, Kevin Daley shouted at Turley, "Shut up you fucking black crybaby bitch. Fuck You. You ain't shit. You're always crying like a bitch." (3 Tr. 30, 32.) Defendants Larry Sampsell and Gerald Marchand "just stood there."  (3 Tr. 32.) Another co-worker once tried to bait Turley into hitting him and shouted, "Black bitch. Fuck you black piece of shit. Get your black ass out of here. We don't want you here anyway." (3 Tr. 82.)

The harassment continued. In March of 2006, the phrase "No Lazy People," intended as a reference to a contemptible racial stereotype perpetuated by Pelc and others at the plant, was written on a wall in the Pickler Department. Testimony revealed that thick, black grease was applied "at least five days per week" to the chair, door handles, and controls used by Turley. (2 Tr. 161) Pelc's response: "it must have been the boon that's doing it." (2 Tr. 165–66.) Later, Pelc destroyed a chair that Turley used, declaring, "That nigger ain't sitting in this chair." (3 Tr. 107.)

The harassment not only continued, it amplified. Incredibly, in June of 2006, the letters "KKK" were spelled out on the wall across from Turley's workstation. Shaken, Turley was again taken to the hospital. As if that were not enough, in February of 2007, the

3

threatening reference to the hate group was written on the wall *again*.

The list goes on. A sad face was drawn on the wall, presumably mocking Turley because he often became upset at work. An ape man was drawn on the wall. Turley was denied bathroom breaks; his time sheets were tampered with; Defendant Sampsell installed a camera trained on his workstation and someone drew an eyeball on the wall; his car was often vandalized; on December 3, 2007, in fact, Turley returned to his car to find a black toy monkey dangling in front of him—it was hung by a noose.

During the trial, Plaintiff played a recording of shrill monkey sounds that were regularly broadcast over the public address system at the Pickler.  That system was also used to threaten Turley. Unidentified employees broadcast to the plant: "We are going to fucking kill you, fucking nigger" and "we're going to kill your fucking Jewish lawyer too." (3 Tr. 81.)

When Turley began work at the steel plant, he enjoyed his job and was a man full of confidence; he possessed a colorful and animated personality. He came in, as one witness put it, displaying his feathers like a "rooster." (2 Tr. 138.) But the unyielding harassment took its toll. And by the time he left, he was broken and dispirited. The company had, again in the words of this witness, "cut the head off the rooster." (2 Tr. 139.)

*** 

The individual defendants in this case are largely not, however, the people who perpetrated these repugnant acts. They are, instead, the supervisors at the plant. Defendant Larry Sampsell was the Manager of Labor Relations and Security at the Lackawanna Plant during the relevant time period. Defendant Gerald Marchand was the Manager of Human Resources from May 2003 until March 2007, after which he continued

as a human resources consultant for several months. Defendant Thomas Jaworski was the Area Manager of the Pickler and Tandem Mill Departments from May 2003 to January 2007. Sampsell and Jaworski both worked at the plant in a management capacity since 1962. Marchand had been an employee there since 1963.

Testimony at trial revealed that these defendants, and others in supervisory roles, took some measures meant to counteract the racial harassment. Plant officials took down the "dancing gorilla" sign, and painted over some of the graffiti. They hired a private investigator. They conducted interviews with employees and retained an outside attorney to investigate the monkey in Turley's car. Although that investigation proved fruitless, Sampsell ordered the installation of lights in the parking lot. Eventually, Turley was assigned an escort to protect him.

Defendants also took remedial measures against known offenders. They suspended Pelc for three days without pay after he threatened Turley, and they suspended him for two days after he admitted that he was responsible for the "King Kong" graffiti. Defendants also suspended another employee for five days after learning of a racially discriminatory comment.

Most of the incidents, however, went unpunished. Defendants concede this. But they argue that the "code of silence," which they say permeated the plant, stymied their best efforts. Employees would warn one another when a manager entered the plant. And, five witnesses eventually admitted that they had withheld information during the company's investigation.

***

In the end, the jury was asked several questions regarding the respective liability of

5

the individual defendants, the corporate defendants, and the relationship between Lackawanna and its parent company. It found in Turley's favor on almost every question: Turley had been subjected to a hostile work environment, which was created or permitted to exist by Defendants; Defendants failed to take adequate corrective action, were grossly negligent, or created a policy under which these practices occurred; none of the Defendants exercised reasonable care to promptly prevent and correct racially harassing behavior; the corporate defendants, and individual-defendant Sampsell, acted in furtherance of their business interests and, through extreme and outrageous conduct, intended to cause Turley severe emotional distress; Turley, in fact, suffered from severe distress; and finally, AM USA was sufficiently integrated with its subsidiary, Lackawanna, to constitute a single employer.

The jury awarded Turley over $25 million in total damages.

## B.    Procedural History

After filing charges of discrimination with the New York State Division of Human Rights and the Equal Employment Opportunity Commission, Turley filed a complaint in this Court on December 6, 2006. (Docket No. 1.) After discovery, Defendants filed a motion for summary judgment on September 20, 2008. (Docket No. 27.) On March 23, 2011, this Court granted Defendants' motion for summary judgment on claims regarding retaliation, overtime, training, leave time, and monitoring. It denied the motion as to Turley's hostile work environment, equal pay, and intentional infliction of emotional distress claims.

This Court then resolved motions in limine (Docket No. 147), lingering discovery issues (Docket No. 141), and trial subpoena matters (Docket No. 149). It subsequently selected eight jurors and began trial on May 15, 2012. (Docket Nos. 159, 162.)  At the

close of Plaintiff's case, Defendants moved for dismissal under Rule 50(a). This Court

denied the motion with the exception of Turley's equal pay claim, which it dismissed.

Ultimately, the jury returned a verdict in Turley's favor on the remaining claims: those for

a hostile work environment and for the intentional infliction of emotional distress. (Docket

No. 191.) The second phase of the trial then began, and, on June 14, 2012, it concluded

with the jury's award of damages. (Docket No. 197.)

   Thereafter, the parties each filed post-trial motions. Turley now seeks attorney fees

(Docket No. 203) and Defendants seek judgment as a matter of law or a new trial (Docket

No. 214.)  Briefing on these motions concluded on November 5, 2012, at which time this

Court took them under consideration.

## III.  DISCUSSION

### A.       Rule 50(b) & 59 Standards

   Rule 50 of the Federal Rules of Civil Procedure permits a court to render judgment

as a matter of law and vacate a jury's verdict if it finds that "a reasonable jury [did] not have

a legally sufficient evidentiary basis" to reach its conclusion. The standard is well settled:

> Judgment as a matter of law may not properly be granted
> under Rule 50 unless the evidence, viewed in the light most
> favorable to the opposing party, is insufficient to permit a
> reasonable juror to find in h[is] favor. In deciding such a
> motion, the court must give deference to all credibility
> determinations and reasonable inferences of the jury, and it
> may not itself weigh the credibility of witnesses or consider the
> weight of the evidence.

Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir.1998) (internal

citations omitted). Indeed, the standard for post-verdict judgment as a matter of law is the

same as that for summary judgment under Federal Rule of Civil Procedure 56. <u>Nadel v. Isaksson</u>, 321 F.3d 266, 272 (2d Cir. 2003) (citing <u>This Is Me, Inc. v. Taylor</u>, 157 F.3d 139, 142 (2d Cir.1998)).  Thus, a district court must deny a motion for judgment as a matter of law unless "there can be but one conclusion as to the verdict that reasonable [jurors] could have reached.'" <u>Id.</u> (quoting <u>Cruz v. Local Union No. Three of the Int'l Bhd. of Elec. Workers</u>, 34 F.3d 1148, 1154-55 (2d Cir.1994)).

The moving party must, however, fulfill the procedural prerequisite of moving for judgment as a matter of law before the case was submitted to the jury. <u>See</u> Fed. R. Civ. P. 50(a)(2); <u>Mealey v. Apartment Rentals</u>, 125 F.3d 844 (2d Cir. 1997). And a party may only make a post-judgment Rule 50(b) motion based on grounds specifically raised at the close of evidence. <u>Lambert v. Genesee Hosp.</u>, 10 F.3d 46, 53–54 (2d Cir.1993). If the movant does not meet the Rule 50 specificity requirement, the Court may not grant judgment as a matter of law unless the result is "required to prevent manifest injustice." <u>Kuper v. Empire Blue Cross & Blue Shield</u>, No. 99 Civ. 1190, 2003 WL 359462, at *4 (S.D.N.Y. Feb. 18, 2003) (citing <u>Russo v. State of New York</u>, 672 F.2d 1014, 1022 (2d Cir. 1982)).

The standard under Rule 59, which permits the court to "grant a new trial on all or some of the issues," <u>see</u> Fed. R. Civ. P. 59(a)(1),  is less stringent. <u>See</u> <u>Manley v. AmBase Corp.</u>, 337 F.3d 237, 244 (2d Cir. 2003). "In contrast to a judgment as a matter of law, a new trial may be granted under Rule 59 even if there is substantial evidence to support the jury's verdict." <u>Mono v. Peter Pan Bus Lines, Inc.</u>, 13 F. Supp. 2d 471, 475 (S.D.N.Y. 1998) (citing <u>Song v. Ives Laboratories, Inc.</u>, 957 F.2d 1041, 1047 (2d Cir. 1992)). And the court need not weigh the evidence in a light most favorable to the non-moving party. <u>Song</u>, 957

F.2d at 1047. Nevertheless, "[a] motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." Townsend v. Benjamin Enters., Inc., 679 F.3d 41, 51 (2d Cir. 2012) (internal citations and quotation marks omitted).

## B.    Defendants' Motion

Defendants seek judgment as a matter of law or a new trial on each of the jury's several findings. They argue that:

> (1) Turley did not prove that AM USA and Lackawanna constituted a single employer;
>
> (2) The evidence did not show that either the individual or the corporate defendants were liable under Title VII, § 1981, or NYHRL;
>
> (3) Turley did not prove that Sampsell or Lackawanna were liable for the common law tort of intentional infliction of emotional distress, nor did he prove that punitive damages were warranted under this tort;
>
> (4) There were prejudicial errors in the verdict form;
>
> (5) The verdicts were the result of passion and prejudice;
>
> (6) The compensatory damages are excessive, and;
>
> (7) The punitive damages are grossly excessive.

Each argument will be addressed in turn below.[2]

---

[2]This Court has reviewed Defendants' other asserted grounds for relief—two evidentiary objections concerning the admission of police reports and judicial notice of the United States Census Bureau Table 107. (Docket No. 214, ¶¶ 16,17.)  But there is no cause to revisit this Court's previous rulings, and those rulings will stand. No further discussion is warranted.

1.      **Parent-Corporation Liability**

The parties stipulated before trial that Lackawanna was Turley's employer. (See *supra*, n. 1.) No such stipulation, however, was entered with regard to the parent corporation, AM USA. Defendants argue, as they did in their Rule 50(a) motion, that Turley was not employed by AM USA. That is, they contend that Turley provided insufficient evidence at trial linking Lackawanna to its parent corporation such that AM USA could be held liable for the racially-offensive environment at the local plant.

At the outset, this Court is cognizant that "it is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiary." See Watters v. Wachovia Bank, N.A., 1550 U.S. 1, 43, 127 S. Ct. 1559, 167 L. Ed. 2d 389 (2007); see also Kiobel v. Royal Dutch Petroleum Co., 621 F.3d 111, 194 (2d Cir. 2010). This is because "the law allows a corporation to organize so as to isolate liabilities among separate entities." Murray v. Miner, 374 F.3d 402, 404 (2d Cir. 1996).

Against this backdrop, whether a parent corporation can be held liable for the acts of its subsidiary depends, first, on the type of claim brought. Under Title VII and § 1981, the relevant point of inquiry is the "single or joint employer test," developed by the National Labor Relations Board and adopted by the Second Circuit in Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235 (2d Cir. 1995). This tests asks whether the parent and the subsidiary can be considered a "single employer." If so, the parent can be held liable for the acts of its subsidiary. To make this determination, courts consider (1) the interrelation of operations, (2) the centralized control of labor relations, (3) common management, and (4) common ownership or financial control. Id. at 1240.

10

While "not every factor need be present, and no particular factor is controlling," Lihli Fashions Corp., Inc. v. N.L.R.B., 80 F.3d 743, 747 (2d Cir. 1996), the second factor—centralized control of labor relations—is the most significant. Cook, 69 F.3d at 1241. In assessing this factor, "the Court must focus its inquiry on the parent's actual involvement in the particular circumstances giving rise to the litigation and determine, '[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination?'" Herman v. Blockbuster Entm't Group, 18 F. Supp. 2d 304, 311 (S.D.N.Y. 1998) (citing Cook, 69 F.3d at 1240).

This Court finds that sufficient evidence exists enabling the jury to find in Turley's favor with respect to this factor.

The collective bargaining agreement, for example, was signed and negotiated by the parent corporation. It contained provisions central to the "particular circumstances giving rise to the litigation," such as those concerning harassment awareness and prevention. Other relevant policies were also prepared and issued by AM USA—not Lackawanna. (See Defs.' Exs. 22, 23, 24.) AM USA also provided, together with the steel workers union, a "Workplace Harassment Awareness and Prevention" training seminar in October of 2007. The parent company's name and logo appeared on the documents associated with the seminar. Moreover, in the process of investigating the monkey hung by a noose in Turley's car, Nevin Hope, who replaced Marchand as Human Resources Manager, provided employees with both AM USA's and Lackawanna's Equal Employment Opportunity policy; he memorialized his reports on AM USA letterhead.

Further, during a police investigation into events at Lackawanna, Defendant Sampsell told the police that before he could provide certain information, he would have

11

to check with AM USA's legal department.[3]

The companies' centralized benefit system and the presence of a centralized "Alertline," which, according to one witness, is "tied into the Corporate headquarters in Chicago" (6 Tr. 74), further demonstrates the unified relationship between Lackawanna and AM USA.  Turley, in fact, utilized the Alertline, which was set up to field workplace complaints from each of AM USA's subsidiaries, to report Pelc's death threat.  A report was then compiled and sent to Lackawanna for further action.

Singling out each piece of evidence, Defendants contend that Turley failed to meet the applicable legal standard; they argue that he failed to prove that AM USA "exercised day-to-day control over employment decisions." (Defs.' Br. at 4; Docket No. 224.)

But, initially, Turley can meet his burden "even absent [a showing of] total control or ultimate authority over hiring decisions." Cook, 69 F.3d at 1241. More importantly, Defendants' piecemeal approach misses the bigger picture. Defendants cite, for instance, Ferguson v. New Venture Gear, Inc., for the proposition that a parent's status as a party to collective bargaining agreement is insufficient to establish control of labor relations. 5:04-CV-1181 FJS/GHL, 2009 WL 2823892 (N.D.N.Y. Aug. 31, 2009).  They also cite E.E.O.C. v. Grace Episcopal Church of Whitestone, Inc., for the proposition that a parent's efforts in setting anti-discrimination policies and procedures are insufficient under this factor. 06-CV-5302(ERK)(WDW), 2007 WL 6831007 (E.D.N.Y. July 3, 2007). Finally, they cite Velez v. Novartis Pharm. Corp., 244 F.R.D. 243, 252 (S.D.N.Y. 2007) for the proposition that a common benefits package does not suggest centralized control of labor

---

[3]Lackawanna did not have a separate legal department.

relations.

What is missing, though, is any authority considering the type of evidence present here in the aggregate. Indeed, in finding a lack of centralized control of labor relations, the court in <u>Velez</u>, seemingly at odds with the holding in <u>Grace Episcopal</u>, relied on the fact that "uncontradicted testimony in the record indicates that [the parent] never tells [the subsidiary's] Human Resources personnel what policies to adopt or how to respond to an employee complaint." <u>Velez</u>, 244 F.R.D. at 251. That is not the case here.

The evidence in <u>Ferguson</u> was also limited, but in a different respect. The court pointed out that "Plaintiffs' *only evidence* regarding this factor is the labor agreement between [parent] and [subsidiary]. 2009 WL 2823892 at *3. Turley offers more than that.

Finally, although the evidence in <u>Grace Episcopal</u> was arguably more substantial, the case is not relevant to this action. The plaintiff there tried to hold the Diocese of Long Island responsible for the acts of a local rector. The differences between a corporate parent, financially invested in its subsidiary, and the structure of a religious institution are readily apparent. Indeed, the <u>Grace Episcopal</u> court, for instance, found that "the underlying purpose of the sexual harassment policies [issued by the "parent"] was not to control labor relations, but to 'provide the Diocese of Long Island with a way to gather the information necessary to make recommendations that will facilitate a just and compassionate outcome to incidents of sexual harassment or abuse in the ministerial relationship.'" 2007 WL 6831007, at *4. The evidence here does not begin to suggest that AM USA's policies served as mere recommendations meant to facilitate a "compassionate outcome." Rather, the evidence indicates that the parent's policies were more than recommendations; they were official regulations.

13

Taken in the aggregate, and considering that much of this evidence pertains to the "particular circumstances giving rise to the litigation," (*i.e.*, the response to Turley's treatment), this Court finds that the evidence presented at trial was sufficient to meet the centralized-control-of-labor-relations factor.

Plaintiff has also presented sufficient evidence to establish an interrelation of operations between Lackawanna and AM USA. In addition to the evidence outlined above, it should be noted that the highest position at Lackawanna was the plant supervisor. As Turley points out, there was no chief executive officer, no chief financial officer, and no chief operating officer at the Lackawanna plant. Financial information was also reported jointly, not separately. And the Board of Managers for AM USA was vested with the authority to indemnify Lackawanna employees so long as those employees were represented by AM USA counsel.  Such a structure suggests that the parent exercises ultimate control over the subsidiary.

This evidence also helps to support the two remaining, albeit less important, Cook factors. See Meng v. Ipanema Shoe Corp., 73 F. Supp 2d 392, 403 (S.D.N.Y. 1999) (common management and common ownership, the final two factors, "are less important as they represent ordinary aspects of the parent-subsidiary relationship"). There is, in fact, no real dispute over these factors.

In the end, "[t]he policy underlying the single employer doctrine is the fairness of imposing liability for labor infractions where two nominally independent entities do not act under an arm's length relationship." Murray v. Miner, 74 F.3d 402, 405 (2d Cir. 1996). In other words, the doctrine imposes responsibility "on an entity that shares decisionmaking authority with the employing entity." Id.  The evidence here is not overwhelming, but it need

14

not be.  Considering it in the aggregate, this Court finds that a reasonable jury could have found that the two entities shared decision making authority when it came to the response to the racial harassment in the Lackawanna plant. As such, the jury's verdict is not "seriously erroneous," see Townsend, 679 F.3d at  51, and it will not be overturned.

The jury also imposed liability on AM USA under the NYHRL. The standard for this claim is slightly different: Turley must have proven that AM USA had the power to hire and fire him, pay him, and have the power to control his conduct. See, e.g., Hargett v. Metro. Transit Auth., 552 F. Supp. 2d 393, 405 (S.D.N.Y. 2008). Defendants, however, do not raise any new arguments as to this claim. And this Court finds that, for the same reasons articulated above, the jury's verdict on this charge should also be upheld.

### 2.	Corporate & Individual Liability — Title VII, § 1981, and NYHRL

An employer is liable for a hostile work environment under Title VII and § 1981 "created by a victim's co-workers if the employer knows about (or reasonably should know about) that harassment but fails to take appropriate remedial action." Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 72 (2d Cir. 2000) (internal citations and quotation marks omitted; parenthesis in original). "Once an employer has knowledge of a racially combative atmosphere in the workplace, he has a duty to take reasonable steps to eliminate it." Id. (quoting Snell v. Suffolk County, 782 F.2d 1094, 1104 (2d Cir.1986)) (modifications omitted).

Individual liability, as opposed to corporate or employer liability, is analyzed under a slightly different standard. To impose individual liability, Turley must have shown that defendants (1) directly participated in the alleged violation; (2) exhibited gross negligence in the supervision of subordinates who committed the wrongful acts; or (3) failed to take

15

action upon receiving information that violations are occurring. <u>Patterson v. County of Oneida</u>, 375 F.3d 206, 229 (2d Cir. 2004).

As for the NYHRL, an individual may be liable under Section 296 if he "actually participates in the conduct giving rise to a discrimination claim." <u>Tomka v. Seiler Corp.</u>, 66 F.3d 1295, 1317 (2d Cir. 1995), *abrogated on other grounds by* <u>Burlington Ind. v. Ellerth</u>, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998). "To 'actually participate' in discrimination, however, an individual employee need not himself take part in the primary violation." <u>Ahmed v. Compass Group</u>, No. 99 Civ. 10032, 2000 WL 1072299, at *5 (S.D.N.Y. August 3, 2000) (quoting <u>Lewis v. Triborough Bridge & Tunnel Auth.</u>, 77 F. Supp. 2d 376, 380–81 (S.D.N.Y.1999)). Instead, "[a] supervisor's failure to take adequate remedial measures can rise to the level of 'actual participation.'"[4] <u>Lewis</u>, 77 F. Supp. 2d at 284.

An employer may be liable under the NYHRL if, through its supervisors, it encouraged, condoned, or acquiesced in a hostile work environment. <u>See e.g.</u>, <u>Bennet v. Progressive Corp.</u>, 225 F. Supp 2d. 190, 210 (N.D.N.Y. 2002); <u>State Div. of Human Rights ex rel. Greene v. Saint Elizabeth's Hosp.</u>, 66 N.Y.2d 684, 687, 496 N.Y.S.2d 411, 487 N.E.2d 268 (1985).[5]

---

[4]Defendants do not dispute that the Sampsell, Marchand, and Jaworski were supervisors at the plant.

[5]Defendants seek judgment as a matter of law on Turley's NYHRL claim because he did not plead this claim. Although Turley did not specifically mention NYHRL § 296 in his complaint, he did plead that "Defendants have discriminated against Plaintiff by denying him the same rights enjoyed by Caucasian employees with regard to the terms and conditions of his employment in violation of 15 New York Executive Law § 291 *et seq.*" (Compl., ¶ 64.) Further, this Court finds that Defendants were not prejudiced by the inclusion of this claim, as the nature of the allegations—discriminatory conduct in violation of New York Human Rights Law—was patently clear. <u>See N.Y. State Elec. & Gas Corp. v. Sec'y of Labor</u>, 88 F.3d 98, 104 (2d Cir. 1996) ("In assessing whether the pleadings should conform to the proof, the pivotal question is whether prejudice would result."). In conformity with Rule 15(b), which mandates amendment of the pleadings such that they conform to the evidence presented at trial, Defendants' motion on this ground is rejected.

Despite the minor differences in the applicable standards, this Court finds that the evidence, discussed below, was sufficient for the jury to find Defendants liable under each of the claims.

Defendants argue that those findings were in error because they took appropriate remedial steps, and therefore, the verdict must be overturned. This argument is unpersuasive. Although Defendants did take some steps—including removing the gorilla sign, washing off graffiti, suspending Pelc, and hiring a private investigator—the jury could have reasonably concluded that those measures were either too little, too late, or both.

Racist graffiti, for instance, remained on the walls for long periods of time, despite management's knowledge of it. "King Kong lives" remained on the walls for "at least a month." (2 Tr. 149–150.) The spray-painted eyeball remained for "several weeks, maybe longer." (3 Tr. 64.) "KKK," the most incendiary of all the graffiti, remained for "approximately a month." (2 Tr. 155.). And although Marchand talked to the employees about the incident, the jury could have reasonably found that this sort of investigation was inadequate. Indeed, when the offensive letters appeared on the wall again, Marchand did not change tactics—he simply conducted various interviews again. In neither instance was he able to find the perpetrator. In fact, much of Defendants' argument is dedicated to Marchand's investigations. But there is no dispute that they often proved fruitless, and with the work environment becoming increasingly more hostile, the jury could have found that he should have done more, done it better, and done it faster. See Zeno v. Pine Plains Cent. Sch.

Dist., No. 10-3604-CV, 2012 WL 5992147, at *11 (2d Cir. Dec. 3, 2012) (in a racial discrimination case, the "jury reasonably could have found that the [defendant] ignored the many signals that greater, more directed action was needed").

The jury could have also deemed the suspensions to be inadequate. Pelc, hurling racial epithets, threatened Turley's well-being. After admitting it, he was suspended only two days. After the King-Kong-graffiti incident, Pelc was suspended only three days and was permitted to work overtime, at a higher rate, that very week. Pelc called his suspension a "vacation." (3 Tr. 26.) No further disciplinary actions were taken.

The jury could have also determined that Defendants hampered police investigations. When Detective Daniel Cardi asked for certain materials, Sampsell insisted on checking with the company's legal department. Detective Cardi "never heard a word after that." (5 Tr. 90–91.) Cardi testified that management was uncooperative.

Further, although in 2007 Defendants hired a private investigator, he was quickly proven to be ineffective. Despite this, defendants did not attempt another such investigation.

The jury could have also properly concluded that other remedial efforts came too late. Parking lot lights, for example, were not installed until 2008, despite Turley's complaints dating to 2005. In Turley's words, the threats "kept coming and coming, year after year." (4 Tr. 85.)

Moreover, the defendants themselves were not simply bystanders. Defendant Jaworski repeatedly called Turley "boy." When Turley told him about the "KK" graffiti, his response, according to Turley, was to laugh and tell Turley to "go get a can of paint and paint it yourself." (3 Tr. 16.) Sampsell, too, laughed off the "KK" and the "KKK" as

horseplay. When Turley complained, Sampsell callously told Turley that "King Kong" was a good movie and that he should go see it. Management also laughed when told about Pelc's death threat. And Sampsell did not keep Pelc from working on the same line as Turley, despite his promise that he would. Sampsell also installed a hidden camera trained on Turley's workstation, and when Turley confronted him about it, Sampsell denied installing it. Sampsell also admitted running a background check on Turley. His explanation, that "maybe there was something in his background that might help me determine if I could help him," (6 Tr. 70), could easily have been discredited by the jury.

Defendants contend that their attempts to intervene were stymied by a "code of silence" in the Pickler. But, based on evidence like that outlined above, the jury was free to find that Defendants' own lackluster effort in stopping the behavior was the true reason it continued and escalated. There is sufficient evidence that management acquiesced in this abhorrent conduct by dismissing it as trivial, conducting investigations in name only, and administering mild, slap-on-the-wrist punishment instead of genuine discipline that would have sent a more forceful message. Given the number of incidents, the duration over which they took place, and their severity, the jury was not unreasonable in concluding that Defendants were grossly negligent for failing to conduct more thorough investigations, or for failing to address Turley's complaints with greater earnestness and alacrity. See Richardson v. N.Y. State Dept. of Corr. Serv., 180 F.3d 426, 442 (2d Cir. 1999) (evidence that employer took some remedial measures did not shield it from liability as matter of law), abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 2420, 165 L. Ed. 2d 345 (2006). Nor was it unreasonable for the jury to conclude that Defendants' acquiescence, if not direct involvement, led to individual liability

19

as well.

Accordingly, the jury's verdict regarding corporate liability for Turley's Title VII claim,[6] in addition to its finding of individual and corporate liability under § 1981 and NYHRL, is neither unreasonable nor erroneous. The verdict will therefore stand.

### 3.    Intentional Infliction of Emotional Distress

The jury found Sampsell and the corporate defendants—but not Marchand or Jaworski—liable under the common-law tort of intentional infection of emotional distress.

An individual is liable for intentionally inflicting emotional distress when his conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." Howell v. New York Post Co., 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350 (1993). Specifically, a plaintiff must prove (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) causal connection between the conduct and injury; and  (4) severe emotional distress. Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir.1999).

Under New York law, an employer can be held liable for this tort based on the acts of its employees, but only if those employees acted within the scope of their employment. Riveiello v. Waldron, 47 N.Y.2d 297, 302, 391 N.E.2d 1278, 418 N.Y.S.2d 300 (1979).

Defendants' argument that the jury's verdict was in error is twofold: First they argue that Sampsell's conduct was not within the scope of his employment. Second, they contend that the mere failure to take appropriate remedial action—the principal charge levied at Defendants—cannot constitute extreme and outrageous conduct.

---

[6]Title VII does not provide for individual liability. See Spiegel v. Schulmann, 604 F.3d 72, 79 (2d Cir. 2010).

As noted by this Court in ruling on both Defendants' summary judgment and Rule 50(a) motions, workplace harassment, alone, is rarely sufficient to sustain an intentional infliction of emotion distress claim against the employer. As the Supreme Court wrote: "The harassing supervisor often acts for personal motives, motives unrelated and even antithetical to the objectives of the employer." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 757, 118 S. Ct. 2257, 2266, 141 L. Ed. 2d 633 (1998). Although that case concerned sexual, not racial, harassment, the Court observed that the "general rule is that [] harassment by a supervisor is not conduct within the scope of employment." Id. But this is not a typical case, and this Court therefore finds that the "general rule" is inapplicable.

As this Court has previously found, see Turley, 803 F. Supp. 2d at 255, there is sufficient evidence that Defendants acted not only for personal reasons, but also to advance their business interests. More thorough investigations, or lengthier suspensions could have hampered steel production. A jury could consider, for example, the fact that Pelc was suspended only a few days, and allowed to work overtime, as evidence that management preferred letting the harassment continue over taking workers off the line. Unlike sexual abuse, which is clearly outside of an employee's duties, the decision to suspend an employee fits squarely within Sampsell's duties at the plant. His failure to take appropriate action, therefore, could lead a reasonable jury to conclude that he was acting in furtherance of the company's business. See E.E.O.C. v. Die Fliedermaus, 77 F. Supp. 2d 460, 473 (S.D.N.Y. 1999) (citing Riviello v. Waldron, 47 N.Y.2d 297, 302, 418 N.Y.S.2d 300, 391 N.E.2d 1278 (1979) ("[T]he determination of whether a particular act was within the scope of the [person's] employment is heavily dependent on factual considerations, and therefore the question is ordinarily one for the jury").

21

A jury could have also reasonably viewed Defendants' refusal to cooperate with the police as intended to protect their bottom line. Police involvement might have led to further scrutiny and negative publicity, with the attendant effects on the plant's business. The jury was entitled to consider this. Accordingly, this prong is sufficiently met.

That leaves Defendants' argument that the conduct in question did not rise to the necessary level of severity. Once again, a supervisor's inaction, or inadequate action, is rarely considered sufficient to sustain an intentional infliction of emotional distress claim. See, e.g., Ross v. Mitsui Fudosan, Inc, 43 F. Supp 2d 477, 392 (S.D.N.Y. 1999). But the duration of such malicious and pervasive harassment here, including what the jury could have found to have been implicit condonation of behavior as extreme as threatening Turley's life, removes this case from those like Ross. And, as noted above, Sampsell's conduct was not limited to mere acquiescence. He laughed off Turley's complaints about the racial hatred that permeated the plant; he disrupted police investigations; he failed to hold perpetrators—as was his job (see 6 Tr. 97)—sufficiently responsible; and, despite a promise to do so, he failed to keep Pelc, a man who had threatened Turley's life, away from Turley at the plant.

What is more, the jury could have found that instead of properly responding to this hate-filled environment, he considered Turley—the lone African-American in the Pickler—to be the problem, and focused his efforts on him by surreptitiously installing a camera in his workstation and performing a background check.

In sum, a jury could find the totality of Sampsell's conduct "beyond the bounds of decency." Accordingly, the evidence meets the legal threshold under New York law, and the jury was entitled to find as it did.

22

Finally, Defendants contend that even if they remain liable for the infliction of emotion distress, the punitive damage award on this claim should be stricken.[7] In essence, they contend that even if their conduct was "extreme and outrageous," it did not "evince a high degree of moral turpitude and wanton dishonesty," justifying punitive damages. See Walker v. Sheldon, 10 N.Y.2d 401, 405, 179 N.E.2d 497 (1961).

But for substantially the same reasons as articulated above, this Court finds that the jury rationally concluded that Sampsell's conduct was sufficiently culpable to warrant punitive damages. Sampsell's conduct, in other words, had a "high degree of moral culpability, which manifest[ed] a conscious disregard of [Turley's] rights." Home Ins. Co. v. Am. Home Prods. Corp., 75 N.Y.2d 196, 203, 550 N.E.2d 930, 934 (1990) (internal citations and quotation marks omitted). As such, punitive damages are justified. Id.

Further, because Sampsell, as a manager, not only "ratified" the outrageous and malicious conduct that Turley was subjected to, but also contributed to it, the jury was permitted to award punitive damages against the corporate defendants. See Loughry v. Lincoln First Bank, N.A., 67 N.Y.2d 369, 378, 494 N.E.2d 70, 74 (1986) ("[P]unitive damages can be imposed on an employer for the intentional wrongdoing of its employees only where management has authorized, participated in, consented to or ratified the conduct giving rise to such damages.").

---

[7]Defendants did not specifically move for judgment as a matter of law with respect to punitive damages in their Rule 50(a) motion.  Defendants argue, however, that their motion for complete judgment subsumed their argument regarding punitive damages. This position has some support. See Todaro v. Siegel Fenchel & Peddy, P.C., No. 04-CV-2939 JS/WDW, 2009 WL 3150408, at *6 n. 8 (E.D.N.Y. Sept. 25, 2009) ("Defendants moved for a complete judgment in their favor. This, ipso facto, means that Defendants sought a legal ruling that they did not discriminate at all, and thus, could not have discriminated maliciously or with reckless indifference."). But the point is moot: whether or not the objection is preserved, this Court finds that the jury's punitive award is permissible.

### 4.    Verdict Form & Jury Charge

Defendants contend that there were errors in the verdict form and jury instructions. "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." Anderson v. Branen, 17 F.3d 552, 556 (2d Cir. 1994) (citing Folger Adam Co. v. PMI Indus., Inc., 938 F.2d 1529, 1533–34 (2d Cir. 1991). Viewing the charge as a whole, Defendants must prove that they were actually prejudiced by the erroneous charge. United States v. Pujana-Mena, 949 F.2d 24, 27 (2d Cir. 1991). If they meet this burden, a new trial is necessary. See United States v. Quinones, 511F.3d 289, 313 (2d Cir. 2007).

Defendants first object to Instruction No. 31 and the related Liability Verdict Question No. 2. Instruction No. 31 states that an employer can be responsible for a hostile work environment created by co-workers if "the plaintiff proves by a preponderance of the evidence that the plaintiff's supervisor or successively higher authority knew . . ., or should have known . . ., of the hostile or abusive work environment and permitted it to continue by failing to take remedial action." Tracking that language, Verdict Question No. 2 asks: "Has the plaintiff proven by a preponderance of the evidence that a supervisor with immediate or successively higher authority over the plaintiff created or permitted the hostile or abusive work environment by not taking reasonable action to address it?"

Defendants argue that this instruction and the associated verdict question allowed the jury to impose liability if it found only one supervisor, as opposed to the employer as a whole, permitted the hostile work environment to continue.  Defendants seem to suggest that other, non-defendant supervisors addressed the hostile work environment even if the named Defendants did not. But for several reasons, this objection is without merit.

24

As an initial matter, this charge contains plain, standard language from pattern jury instructions, with no substantive changes. <u>See</u> O'Malley *et al.*, Federal Jury Practice and Instructions § 171.22; <u>see also</u> <u>United States v. Dixon</u>, No. 09-CR-6046L, 2011 WL 4829718, at *1 (W.D.N.Y. Oct. 12, 2011) (denying objection because, in part, the instruction was plain and standard).

Furthermore, Defendants have not proven that they were actually prejudiced by any alleged error. The jury found each individual defendant—Turley's supervisors—individually liable. Although Defendants allude to the possibility that another supervisor somehow redeemed the acts and omissions of the individual defendants, they point to no such person in their moving papers.

Finally, although it contains a different burden of proof, the jury rejected Defendants' affirmative defense and found that the corporate defendants, *as a whole*, did not exhibit reasonable care in responding to the hostile work environment. (<u>See</u> Liability Verdict Form Question No. 8.) Accordingly, this objection is rejected.

Defendants next object to Liability Verdict Question Nos. 10–13, arguing that they allowed the jury to impose corporate liability for intentional infliction of emotional distress without finding all the necessary elements of the tort. To sustain an intentional infliction of emotional distress claim against an employer, the plaintiff must not only prove all the traditional elements of the claim, but he must also show that those responsible for the distressing conduct acted within the scope of their employment. <u>See</u> <u>Riveiello</u>, 47 N.Y.2d at 302.

To this end, Question No. 10 of the Verdict Form asks: "Has the plaintiff proven by a preponderance of the evidence that the co-workers or supervisors who were responsible

for the conduct he experienced acted in furtherance of the corporate employers' business and not for their own personal reasons?" Question Nos. 11–13 also contain the language "co-workers or supervisors," and it is this language with which Defendants take issue. They contend that the jury could have found that a supervisor (not acting with intent to cause emotional distress) acted in furtherance of the employer's business, while a co-worker (acting with the requisite "extreme and outrageous" intent) did *not act* in furtherance of the business. As such, Defendants, argue, there is the possibility that the jury did not find that Turley proved each element of the claim as against the corporate defendants.

This objection fails for two reasons.

First, it is a tortured interpretation of the question. Defendants theorize that the jury could have split the question, attributing one element of the offense to one group of defendants and another element to a different group. But the question is straightforward: it asks whether *those responsible for the conduct* Turley experienced, no matter who they might be, acted in furtherance of the employee's business. This Court finds no possibility of confusion therein.

Second, the jury's findings demonstrate it was not confused. Indeed, it could not have been, as Defendants argue, that the jury found the supervisors as a class acted in furtherance of the business, but not outrageously, for they found Defendant Sampsell, a supervisor, liable for extreme and outrageous conduct. This objection is therefore also rejected.

### 5. Passion and Prejudice

Pointing to the request of Turley's attorney for a specific damage award, and the copious awards conferred in this case, Defendants argue that a new trial, not remittitur, is

necessary because the verdict is a result of passion and prejudice.

This Court disagrees.

First, the jury was instructed that, "the damages that you award must be fair and reasonable, neither inadequate nor excessive," and this Court admonished the jury to be "guided by dispassionate common sense" and "sound discretion." Lacking evidence to the contrary, this Court presumes that those instructions were followed. See CSX Transp., Inc. v. Hensley, 556 U.S. 838, 841, 129 S. Ct. 2139, 173 L. Ed. 2d 1184 (2009) ("The jury system is premised on the idea that rationality and careful regard for the court's instructions will confine and exclude jurors' raw emotions"); see also United States v. Whitten, 610 F.3d 168, 191 (2d Cir. 2010) ("We presume that juries follow instructions . . . .").

Second, Defendants claim that the jury was unjustly influenced by "anchoring"—the practice of suggesting an appropriate figure to the jury during summation. But this practice, though possibly disfavored, is not prohibited. See Ramirez v. N.Y. City Off-Track Betting Corp., 112 F.3d 38, 40 (2d Cir. 1997). And Defendants themselves engaged in the practice, suggesting $200,000 to $250,000 to be an appropriate award. (16 Tr. 74.)

Finally, this Court finds the jury's award to be a reflection not of passion or prejudice but of the damages it believed were necessary to compensate Turley for extreme anguish and to sufficiently punish an especially wealthy defendant for reprehensible conduct.

### 6.    Compensatory Damages

Defendants also contend that the compensatory damages—totaling $1,320,000—are excessive, requiring remittitur.

"A jury has broad discretion in measuring damages," Dotson v. City of Syracuse, No. 5:04-CV-1388 NAM/GJD, 2011 WL 817499, at * 13 (N.D.N.Y. Mar. 2, 2011), but "there

must be an upper limit, and whether that has been surpassed is . . . a question of law," Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 435, 116 S. Ct. 2211, 2223, 135 L. Ed. 2d 659 (1996) (quoting Dagnello v. Long Island R.R. Co., 289 F.2d 797, 806 (2d Cir. 1961).

If a district court finds that the limit has been eclipsed, and that the damages are excessive, it may order a new trial, a new trial limited to damages, or remittitur. Thorsen v. County of Nassau, No. CV 03-1022, 2010 WL 2671816, at * 11 (S.D.N.Y. 2010) (citing Cross v. N.Y. City Transit Auth., 417 F.3d 241, 258 (2d Cir. 2005)).

Remittitur, "a limited exception to the sanctity of jury fact-finding", see Akermanis v. Sea-Land Serv., Inc., 688 F.2d 898, 902 (2d Cir.1982), "is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial," Earl v. Bouchard Transp. Co., 917 F.2d 1320, 1328 (2d Cir. 1990). It is appropriate where "a properly instructed jury, hearing properly admitted evidence, nevertheless makes an excessive award." Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd., 930 F.2d 1021, 1027 (2d Cir. 1991). A court's decision to compel such a choice depends on whether the jury's award is "so high as to shock the judicial conscience and constitute a denial of justice." Payne v. Jones, 696 F.3d 189, 199 (2d Cir. 2012) (quoting Zarcone v. Perry, 572 F.2d 52, 56 (2d Cir. 1978).[8]

****

The Second Circuit recently wrote that "[n]either cases arising under federal law nor those arising under state law provide a clear line as to whether [the award] for emotional

---

[8]But see infra at 35. The Payne court, considering punitive damages, found that "a degree of excessiveness less extreme than 'grossly excessive' will justify a 'shocks the conscience' finding that supports imposing a remittitur." 696 F.3d at 200. But even under this arguably lower standard, this Court finds that the compensatory award should stand.

distress on the basis of a trial record such as that created in the present case deviates so materially from what would be reasonable compensation as to shock the judicial conscience."

These words were not written about this case, see Lore v. City of Syracuse, 670 F.3d 127, 177 (2d Cir. 2012), but they could have been. Perhaps that statement is even truer here. Indeed, while both parties point to cases dealing with harassment generally, it is not surprising that neither party is able to identify any cases beginning to replicate the facts in this case. That poses a significant difficulty, because one of the most concrete methods used to determine whether an award "shocks the judicial conscience, is to "consider[ ] . . . the amounts awarded in other, comparable cases." DiSorbo v. Hoy, 343 F.3d 172, 183 (2d Cir. 2003).

But that is not to say that useful analogies, comparisons, and contrasts cannot be gleaned from the case law. In fact, several courts have found that emotional distress awards within the Second Circuit can "generally be grouped into three categories of claims: 'garden-variety,' 'significant' and 'egregious.'" See, e.g., Olsen v. County of Nassau, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009); Mugavero v. Arms Acres, Inc., 680 F. Supp. 2d 544, 578 (S.D.N.Y. 2010).

In "garden variety" emotional distress claims, "the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury." Khan v. Hip Centralized Lab. Servs., Inc., No. CV-03-2411, 2008 WL 4283348, at *11. "Garden variety" emotional distress claims "generally merit $30,000 to $125,000 awards."

29

Mugavero, 680 F. Supp. 2d at 578.[9]

"Significant" emotional distress claims "are based on more substantial harm or more offensive conduct, and are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses." Khan, 2008 WL 4283348, at *11. "Significant" damages merit awards at least as high as $175,000. See, e.g., Mugavero, 680 F. Supp 2d at 578 (upholding total emotional distress award of $175,000 where the plaintiff offered evidence of "more than a 'garden variety' claim").

Finally, "egregious" emotional distress claims "generally involve either 'outrageous or shocking' discriminatory conduct or a significant impact on the physical health of the plaintiff." Khan, 2008 WL 4283348, at *12. Substantially higher awards are appropriate in for this type of claim. See, e.g., Ramirez,112 F.3d at 38 (affirming a $500,000 award, reduced from $1,145,625 by the district court, in an employment discrimination case).

This Court can therefore use this formulation as a guidepost. Further, although not entirely analogous, both sides point to cases that they believe support their positions. Turley points to relatively large awards. See id. ($500,000); Osorio v. Source Enters., Inc., No. 05 CIV. 10029 (JSR), 2007 WL 683985 (S.D.N.Y. Mar. 2, 2007) (upholding a $4 million compensatory award, but only because emotional distress damages were coupled with significant reputational harm); Chopra v. Gen. Elec. Co., 527 F. Supp. 2d 230 (D. Conn. 2007) (affirming $500,000 award for emotional distress ). As is evident, however, none of these cases establish precedent for the magnitude of damages, for emotional distress

---

[9]The Court in Khan, citing Rainone v. Potter, 388 F. Supp. 2d 120, 122 (E.D.N.Y. 2005), identified a lower range of compensation for garden-variety claims. But that range has not been widely accepted and has been amended to reflect the present day value of the dollar. See, e.g., Olsen, 615 F. Supp. 2d at 46 n.4.

alone, present here.

For their part, Defendants point to a series of significantly smaller awards. See, e.g., Khan, 2008 WL 4283348, at *6–*12 (reducing $200,000 award to $50,000); Rainone, 388 F. Supp. 2d at 124–26 (reducing $175,000 award in gender failure-to-promote case to $50,000).

 Defendants also rely heavily on Lore, where the Second Circuit recently affirmed a $250,000 award for compensatory damages. 670 F.3d 127. There, the plaintiff suffered from anxiety, tension headaches, and stomach problems as a result of sexually discriminatory conduct at her workplace; she couldn't sleep because she was fearful. Id. at 146–47. Stress prompted her to consult a doctor, who prescribed an antidepressant. Id. The court highlighted testimony that revealed she was once a "gregarious person" who, as result of the conduct, became "reclusive." Id. Her depression led her mother to be "afraid she was going to do something to hurt herself."  Id.

Although the court affirmed the award,  it characterized it as "generous" and noted that remittitur would have been necessary if not for the reputational harm the plaintiff suffered. Id. at 179. It also found that "[o]ne would not reasonably expect emotional distress on the part of [plaintiff] . . . to be on par with the emotional distress suffered by a person who was discriminatorily fired." Id. Because the court arguably found $250,000 to be a borderline-excessive award, Defendants suggest that this number—$250,000—is the upper limit for pain and suffering in employment-discrimination cases where the plaintiff, like Turley, was not terminated.

This Court must be cautious, however, not to apply bright-line standards when performing this exceedingly fact-intensive inquiry. Instead, it must "bear[] in mind that any

31

given judgment depends on a unique set of facts and circumstances." See Scala v. Moore McCormack Lines, 985 F.2d 680, 684 (2d Cir. 1993). So considered, this Court finds that the unique facts and circumstances of this case set it apart from others. It is not hyperbole to say that, for roughly three years, Turley endured some of the most hate-filled and racist behavior imaginable. As a result, Turley cried daily; he lost 30 pounds; he suffered from panic attacks, depression, isolation and anxiety; on two separate occasions, unable to withstand the hatred any longer, he was taken to the hospital directly from work. At trial, Dr. Syed Jaffri, a psychiatrist, confirmed that Turley suffered from Post-Traumatic Stress Disorder and Adjustment Disorder. He opined that Turley would continue to have triggers the rest of his life. At one visit in 2008, Dr. Jaffri remembered that Turley presented as "noticeably distraught, depressed, hopeless, [and] helpless." (8 Tr. 53.) The jury, too, witnessed a defeated and dispirited man in the courtroom. This apparently left a marked impression.

As already discussed, the jury reasonably attributed the atmosphere at the plant to the inaction, or worse, acquiescence of Defendants. Defendants argue that the distress Turley suffered was neither significant nor egregious. This Court cannot agree; the jury recognized that Turley suffered immensely, and medical evidence, his own testimony, and that of his co-workers evidenced as much.

Indeed, there can be no serious dispute that Turley experienced prolonged, egregious conduct, and that he had significant emotional and physical repercussions from the harassment that he endured at the Pickler. This is not a case where a black employee was simply passed over for a promotion, terminated out of bias, or retaliated against for making a complaint. Nor is this a single incident of racial insensitivity or discrimination.

Turley was instead made to suffer daily ignominies and outrageous abuses. Testimony revealed that Turley, once a proud and animated athlete, was rendered a mere shell of the man he once was.

Just recently, the Second Circuit upheld a $1 million compensatory award for the emotional distress that a black high school student suffered due to the school district's indifference to the racial harassment he faced. See Zeno, 2012 WL 5992147, at *13. Differences in this case are again easy to spot. The plaintiff in Zeno, for example, was only a student, and the jury may have concluded that he would continue to be affected by the harassment for the rest of his life. But the case highlights the fact-intensive nature of this determination. It recognizes, in other words, that a million-dollar verdict for racial harassment is not *de jure* excessive. Likewise, fully aware that verdicts of this sum for emotional distress are exceptional, this Court finds the circumstances of this case to be equally exceptional. As such, the award is warranted, and it will not be reduced.

One final matter on this topic requires attention. The jury awarded Turley a total of $1,060,000 for his claims under Title VII, § 1981, and the NYHRL; it then awarded him a total of $260,000 for his intentional infliction of emotional distress claim. Defendants thus contend that the compensatory award is duplicative. Defendants, however, fail to show that they objected to the division of the claims on the verdict sheet, which allowed the jury to award damages for each one. See Lambert v. Genesee Hosp., 10 F.3d 46, 53–54 (2d Cir.1993) (A party may only make a post-judgment Rule 50(b) motion based on grounds specifically raised at the close of evidence). Second, the jury was instructed not to award duplicitive damages (16 Tr. 96), an instruction which the jury is presumed to have followed. Weeks v. Angelone, 528 U.S. 225, 234, 120 S. Ct. 727, 145 L. Ed. 2d 727 (2000). And

third, "a jury's award is not duplicative simply because it allocates damages under two distinct causes of action." Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 497 (2d Cir. 1995). This basis for a new trial is therefore rejected.

### 7.    Punitive Damages

Last, Defendants seek remittitur or a new trial on punitive damages. Defendants claim that the $24,000,000 punitive award is excessive and should be set aside.[10]

This Court agrees.

"Awards of punitive damages are by nature speculative, arbitrary approximations." Payne, 696 F.3d at196. Nonetheless, courts have an obligation to ensure that such awards "be fair, reasonable, predictable, and proportionate." Id. Judicial review of punitive damages awards, in fact, "has been a safeguard against excessive verdicts for as long as punitive damages have been awarded." Id. (citing Honda Motor Co. v. Oberg, 512 U.S. 415, 421, 114 S. Ct. 2331, 129 L. Ed. 2d 336 (1994)).

A court's authority to limit an award derives in part from the Due Process Clause of the Fourteenth Amendment. Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 433, 121 S. Ct. 1678, 1683, 149 L. Ed. 2d 674 (2001). When a federal court reviews a state-court award, punitive damages violate the Due Process Clause if they are "grossly excessive." Id.; BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996). But, as recently noted by the Second Circuit, a federal trial court

---

[10]The jury awarded Turley $20,000,000 as against the corporate defendants for violations of Title VII and § 1981. It awarded him $4 million in emotional distress punitive damages as against ArclerlorMittal Lackawanna, LLC, and another $5,000 as against Defendant Sampsell. (See Damages Verdict Sheet; Docket No. 197-1.) Because there is no cap on punitive damages under § 1981, as there is for Title VII, the jury's award for Title VII violations is apportioned to § 1981. See, e.g., Funk v. F & K Supply, Inc., 43 F. Supp. 2d 205, 225 (N.D.N.Y. 1999); Gonzalez v. Bratton, 147 F. Supp. 2d 180, 204 (S.D.N.Y. 2001); Kauffman v. Maxim Healthcare Servs., Inc., 509 F. Supp. 2d 210, 220 n. 13 (E.D.N.Y. 2007).

reviewing its own jury's verdict for excessiveness has an independent "supervisory authority." Payne, 696 F.3d at 200. Therefore, "a degree of excessiveness less extreme than 'grossly excessive' will justify" remittitur in cases such as this. Id.

The three guideposts articulated by the Supreme Court in Gore inform this inquiry. 517 U.S. at 574–75. Those guideposts are: (1) degree of reprehensibility of the defendant's conduct, (2) relationship of the punitive damages to the compensatory damages, and (3) criminal and civil penalties imposed by the state's law for the misconduct in question. Id.; Payne, 696 F.3d at 200. Each is addressed below.

### a. Degree of Reprehensibility

The degree of reprehensibility of the defendant's misconduct is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." Gore, 517 U.S. at 575. "This guidepost is particularly important and useful because punitive damages are intended to punish, and the severity of punishment, as in the case of criminal punishments, should vary with the degree of reprehensibility of the conduct being punished." Payne, 696 F.3d at 201. The Supreme Court has outlined five factors relevant to determining the reprehensibility of a defendant's conduct. State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003). Accordingly, courts should consider whether:

> [T]he harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

Id.

It is beyond dispute that the jury found Defendants' conduct to be particularly reprehensible. The evidence supports this conclusion. The overt racist harassment lasted for more than three years. It did not improve with time; it escalated. Investigations were feeble and perfunctory; responses were cursory. Defendants exhibited an indifference to Turley's health, safety, and general well-being. The effect this had on Turley has already been detailed. It is enough to note here that it was deleterious and pervasive.

Some amount of punitive damages are thus appropriate based on this factor alone. However, aside from the physical manifestations of emotional harm, the harms were purely emotional; Defendants, that is, engaged in no "physical assault." State Farm, 538 U.S. at 426. And there is no evidence that Turley was targeted because of financial vulnerability. At least two of the factors described in State Farm are therefore absent. Further, Defendants did not, for the most part, perpetrate the racist acts; instead, they failed to remedy them or acquiesced in them. This distinction also limits, to a degree, their reprehensibility.

### b. Ratio

"Courts must ensure that the measure of punishment is both reasonable and *proportionate* to the amount of harm to the plaintiff and to the general damages recovered." State Farm, 538 U.S. at 426 (emphasis added). This factor—the ratio between the compensatory and punitive damages—is the "most commonly cited indicum of an unreasonable or excessive punitive damages award." Gore, 517 U.S. at 580. A bright-line test, however, is inappropriate, see id. at 582–83, as "it is difficult or impossible to make useful generalizations," Payne, 696 F.3d at 201. But, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages will satisfy due process."

State Farm, 538 U.S. at 425.

The jury awarded Turley just over $1 million in compensatory damages for his § 1981 claim and $260,000 for his intentional infliction of emotional distress claim. Punitive damages for those claims amounted to $20 million, and just over $4 million, respectively. The ratio of compensatory to punitive damages for the § 1981 claim is thus 20 to 1, while the intentional-infliction-of-emotional-distress ratio is 16 to 1.

This is excessive. The Supreme Court has found that "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 22–23, 111 S. Ct. 1032, 1046, 113 L. Ed. 2d 1 (1991). Over ten years later, the Supreme Court affirmed the continued validity of this sentiment, but also noted that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." State Farm, 538 at 425. Heeding the guidance from the Supreme Court in cases like Haslip, Gore, and State Farm, courts in this district, and throughout the country, have recognized the overarching principle that a single-digit ratio is "more likely to comport with due process" than a double-digit one. Id.; see E.E.O.C. v. Sterling Jewelers Inc., 788 F. Supp. 2d 83, 89 (W.D.N.Y. 2011); Bridgeport Music, Inc. v. Justin Combs Pub., 507 F.3d 470, 488 (6th Cir. 2007); S. Union Co. v. Sw. Gas Corp., 415 F.3d 1001, 1010, 423 F.3d 1117 (9th Cir. 2005).

This is true of discrimination cases as well. The court in Zakre v. Norddeutsche Landesbank Girozentrale, for example, found a punitive damages award of $2.5 million, where compensatory damages were roughly $1.5 million, to be disproportionate. 541 F. Supp. 2d 555, 567 (S.D.N.Y. 2008). There, the jury found the defendant liable for

37

purposely limiting the career opportunities of the plaintiff, unfairly criticizing her, and exhibiting a pattern of sex discrimination and unfair compensation. Id. at 564-65. The court recognized this as reprehensible behavior, but, because the compensatory damages were substantial, it reduced the award even though the initial ratio was less than 2:1. Id. The court ordered remittitur in the amount of $600,000.

In Thomas v. iStar Financial, Inc., the jury found that the plaintiff's supervisor disproportionately targeted black employees for criticism and termination. 438 F. Supp. 2d 348, 355 (S.D.N.Y. 2006). The supervisor told black employees, including the plaintiff, that he "knew what it was like to grow up poor" and that "he came from where they came from and grew up in the 'hood,' poor and on welfare." Id. "He also called a former black employee a "nigger," and told her she had to try harder because she is black." Id. The jury awarded $1,600,000 in punitive damages, resulting in a punitive-to-compensatory-damages ratio of approximately 3.6:1. The district court reduced the punitive damages to $190,000. On appeal, the Second Circuit affirmed, and noted the substantial compensatory award "weighs heavily in favor a punitive damages award equal to or less than" the compensatory figure. 652 F.3d 141, 144 (2d Cir. 2011), cert. denied, 132 S. Ct. 856, 181 L. Ed. 2d 552 (2011).[11]

Turley seems to recognize that, post Gore, such a disproportionate award as was issued here has never been accepted by the courts. Although he cites no fewer that 19 cases to support his argument that "higher ratios are needed to punish reprehensible conduct," not one of those cases reflects an award of the type of disparity present here.

---

[11]But it must be remembered that no two cases are identical. The plaintiff in iStar was unsuccessful on his hostile work environment claim. And the offensive racial remarks were "occasional and isolated." Id. at 144. That was not the case here.

To be sure, one of the cases he points to upheld a punitive award 150 times greater than the compensatory award, but that was only because the jury awarded nominal compensatory damages. This is an exception to the proportionality rule. See Lee v. Edwards, 101 F.3d 805, 811 (2d Cir.1996) (where compensatory damages are nominal, "a much higher ratio can be contemplated").

The jury's award here was far from nominal. And although Defendants' net worth, which is significant, can be considered in assessing punitive damages, see Smith v. Lightning Bolt Products, Inc., 861 F.2d 363, 373 (2d Cir. 1988); Gore, 517 U.S. at 591 (Breyer, J., concurring), great wealth alone "cannot justify an otherwise unconstitutional punitive damages award," State Farm, 538 U.S. at 427. As noted by a sister court in a separate case, "In light of the substantial amount of damages already awarded to compensate plaintiff, these [disproportionate] ratios underscore the excessiveness of" the punitive award. Chopra, 527 F. Supp. 2d at 246. As such, a reduction in the punitive damages award is necessary to achieve greater proportion to the harm that Defendants caused.

### c.   Sanctions for Comparable Conduct

The third, and arguably least important, guidepost assesses the "disparity between the punitive damages award and the 'civil penalties authorized or imposed in comparable cases.'" State Farm, 538 U.S. at 428; Gore, 517 U.S. at 583.

There are two related statutes pertinent to the type of misconduct present in this case: the New York Human Rights Law and Title VII. Both of these limit the amount of damages recoverable. NYHRL permits damages up to $100,000 for willful, wanton, or malicious discrimination. See N.Y. Exec. Law § 297(4)(c)(vi). And Title VII caps the

39

combined punitive and compensatory damages at $300,000. <u>See</u> 42 U.S.C. § 1981a(b)(3).

Although Congress imposed no limits on punitive damages recovered pursuant to §1981,

these related limitations should be considered. <u>See, e.g.</u>, <u>Gore</u>, 517 U.S. at 583 ("[A]

reviewing court engaged in determining whether an award of punitive damages is

excessive should accord substantial deference to legislative judgments concerning

appropriate sanctions for the conduct at issue") (internal quotation marks omitted); <u>iStar</u>,

508 F. Supp. 2d at 263. Accordingly, like the two before it, this factor also suggests that

the award should be reduced.

****

Considering the totality of the circumstances, including the degree of reprehensibility

at issue, the singular nature of this case,  the large compensatory award, and the ultimate

purpose of punitive damages—to punish and deter future misconduct—this Court finds that

it must significantly reduce the punitive award to satisfy the "less-than-grossly-excessive"

test outlined in <u>Payne</u>. Specifically, this Court finds that a $5 million punitive damage award

sufficiently punishes and deters Defendants while reflecting the upper most limit

permissible under the law.[12] If Turley does not accept the remittitur, this Court will vacate

the punitive damages award and conduct a new trial limited to the question of punitive

damages. <u>See</u> <u>iStar</u>, 652 F.3d at 145–47 ("[T]his Court has . . . provided plaintiffs with the

option of a new trial [] where a punitive damages award has been deemed excessive");

<u>Vasbinder v. Scott</u>, 976 F.2d 118, 122–23 (2d Cir. 1992).

---

[12]$4 million will be attributed to the § 1981 claim, and $1 million to the emotional distress claim. The emotional distress claim requires further division. $1,250 will be attributed to Larry Sampsell and $998,750 to ArcelorMittal Lackawanna, LLC. This equals a roughly 4:1 ratio for each of the claims.

**C.      Plaintiff's Motion for Attorney Fees**

To ensure that federal rights are adequately enforced, the United States Code provides that a prevailing party in civil rights action may recover, subject to the court's discretion, "a reasonable attorney's fee." See 42. U.S.C. § 1988; see also 42 U.S.C. § 2000e–5(k);  Perdue v. Kenny A. ex rel. Winn, 130 S. Ct. 1662, 1671, 176 L. Ed. 2d 494 (2010). "A 'reasonable' fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case." Id.

In this Circuit, if the court finds a fee award to be appropriate, it will set a "reasonable hourly rate," bearing in mind all the case-specific variables. Adorno v. Port Auth. of N.Y. & N.J., 685 F. Supp. 2d 507, 510-11 (S.D.N.Y. 2010) (quoting Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 522 F.3d 182, 190 (2d Cir. 2008).[13] The court then uses that rate to calculate the presumptively reasonable fee by multiplying the rate by the number of hours reasonably expended. Id.

Plaintiff seeks a judgment for fees in the amount of $523,416.00.  This is based on 2,433.90 hours of work expended by various lawyers, paralegals, and student law clerks. Defendants object. They contend that several attorneys' rates are too high, that time spent pursuing unsuccessful claims must be eliminated, and that many entries are redundant or excessively vague.

---

[13]To arrive at that fee, district courts should also consider the twelve Johnson factors: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. See Arbor Hill, 522 F.3d at 190 (citing Johnson v. Georgia Highway Exp., Inc., 488 F.2d 714, 717 (5th Cir. 1974)).

41

1.      **Attorney Rates**

Defendants seek to limit the partners' fees to $250 per hour. See Ghadersohi v. Health Research, Inc., 08-CV-355S, 2011 WL 5040668 (W.D.N.Y. Oct. 21, 2011) (finding that a $250 rate to be appropriate for partner-level attorneys). This proposal would affect only Donald Eppers, senior counsel for Turley, who billed at a rate of $295 per hour, and Lisa Sofferin, who billed at $275 per hour.

"The most critical factor in a district court's determination of what constitutes reasonable attorney's fees in a given case is the degree of success obtained by the plaintiff." Barfield v. N.Y. City Health & Hosps. Corp., 537 F.3d 132, 152 (2d Cir. 2008). Mr. Eppers was the senior attorney on this case, and he and his firm certainly attained a considerable degree of success for Mr. Turley.  Ms. Sofferin, too, is an experienced litigator and was lead counsel on the case for several years before she withdrew from Brown & Kelly, LLP. According to the records submitted, she certainly contributed to the favorable outcome. But their rates remain slightly excessive for this district. See Simmons v. N.Y. City Transit Auth., 575 F.3d 170, 174 (2d Cir. 2009) (courts "should generally use the hourly rates employed in the district in which the reviewing court sits in calculating the presumptively reasonable fee"); see also Ghadersohi, 2011 WL 5040668, at *6; Williams v. Beemiller, Inc., No. 05–CV–836, 2010 WL 891001, at  (W.D.N.Y. Mar. 10, 2010), (collecting cases and reducing rate to $250), rev'd on other grounds, 416 F. App'x 97 (2d Cir. 2011). Therefore, each of their rates will be reduced by $25 per hour.

Although the rates sought for associates and paralegals in the case are $25 and $15 over the rates approved in Ghadersohi, this Court does not find them to be excessive. They will stand. No information is provided about the law clerks, who billed at $95 per hour.

Defendants seek to reduce their rate to $75 per hour. This Court finds such a reduction to be appropriate.

### 2. Time Expended

This Court must exclude any hours that were "excessive, redundant, or otherwise unnecessary." Hensley v. Eckerhart, 461 U.S. 424, 434, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983). Indeed, all time must be reasonably expended. Louis Vuitton Malletier S.A. v. LY USA, Inc., 676 F.3d 83, 111 (2d Cir. 2012). In making this determination, the court must ask whether the attorneys exercised "billing judgment." See Anderson v. Rochester–Genesee Reg'l Transp. Auth., 388 F. Supp. 2d 159, 163 (W.D.N.Y. 2005). Defendants contend that Plaintiff's attorneys failed to use billing judgment and that many hours were expended litigating claims that were ultimately unsuccessful; other entries, they argue, are vague or redundant. In short, they contend that the hours must be heavily reduced. They seek to cut the total fee to 4/7ths of its current figure, or alternatively, to reduce the number of hours billed by 30%.

There is no dispute that Turley was unsuccessful on several claims, including those for disparate treatment and retaliation. If those claims "are distinct in all respects, the hours spent on the unsuccessful claim should be excluded." Hensley, 461 U.S. at 440. In Hensley, the Court divided fee-shifting cases into two broad types: those that involve "distinctly different claims for relief that are based on different legal facts and legal theories" and those "involve a common core of facts" or are "based on related legal theories." Id., at 434–35; Kassim v. City of Schenectady, 415 F.3d 246, 253 (2d Cir. 2005). "In the more unitary cases—those involving a common core of facts or related legal theories—it is more 'difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be

viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.'" Id. (quoting Hensley, 461 U.S. at 435).

There can be no serious dispute that this case falls into the second or "unitary" category, as all claims arise out of Turley's general mistreatment at the plant. Some reduction, however, remains necessary considering that Turley did not obtain the full relief he sought. Furthermore, "[h]ours spent . . . on claims wholly ineligible for fee-shifting, must be excluded from the reasonable hours spent on the case . . . ." Millea v. Metro-N. R. Co., 658 F.3d 154, 168 (2d Cir.  2011). This includes Turley's state-law emotional distress claim.

Defendants also point out the inevitable overlap that occurred when Turley's initial attorney left the case. Despite this, the attorneys' fee schedule does not account for the unnecessary double effort. Defendants also point to exaggerated entries. For example, Turley's principal trial attorneys, Mr. Eppers and Mr. Mills, and a paralegal, Ms. Dingey, all billed 9.4 hours for attendance at trial on June 11, 2012. Trial adjourned that day after a morning session, however. These three also billed for 3.4 hours for a technology-training session in the courtroom. Those sessions last no more than an hour.

Due to instances such as these, in addition to the reductions related to the lack of success on several of Turley's claims, this Court finds that an overall reduction of 15% in the total hours is appropriate. See Grievson v. Rochester Psychiatric Ctr., 746 F. Supp. 2d 454, 466 (W.D.N.Y. 2010) (quoting Kirsch v. Fleet St., Ltd., 148 F.3d 149, 173 (2d Cir. 1998) (A "'practical means of trimming the fat' is to apply a reasonable percentage reduction to the total number of hours requested").

Adjusting the time for each attorney, paralegal, and law clerk by 15%, and factoring in the adjusted rates from above, this Court approves a fee award of $437,323.30. This figure is subject to change if the litigation in this case continues.

This Court finds the costs, $32,711.42, to be reasonable.

## IV.  CONCLUSION

The jury determined that Elijah Turley endured extraordinary racial harassment, the likes of which this country had hoped to leave in its past. It found that the responses to this treatment were alarmingly inadequate. It determined that Turley suffered, and that he should be compensated for that suffering. It concluded that deterrence and punishment were necessary. These determinations will not be upset, with one exception: this Court vacates the punitive damages award and orders a new trial on punitive damages unless Turley accepts a reduced punitive damages award of $5 million.

Last, this Court finds the award of attorney fees to be appropriate, and it approves them in the amount of $437,323.30. It awards Plaintiff costs in the amount of $32,711.42.

## V.  ORDERS

IT HEREBY IS ORDERED, that Defendants' Motion for Judgment as a Matter of Law (Docket No. 214) is DENIED; their related Motion for a New Trial or Remittitur is GRANTED in part and DENIED in part.

FURTHER, a new trial on punitive damages will be held unless Turley accepts a reduced punitive damages award. Specifically, this Court orders a reduction in punitive damages as follows:

<u>Corporate Defendants</u>: $4 million under Title VII & § 1981.

<u>ArccelorMittal Lackawanna, Inc.</u>: $998,750 for intentional infliction of emotional
distress.

<u>Larry Sampsell</u>:  $1,250 for intentional infliction of emotional distress.


FURTHER, Plaintiff's Motion for Attorney Fees and Costs (Docket No. 203) is

GRANTED, in accordance with this Decision.

FURTHER, if Plaintiff chooses to accept the reduced award, he must file an affidavit

indicating so with the Clerk of the Court within 30 days. If no such affidavit is received, or

if Plaintiff affirmatively declines to accept the reduced award, a new trial on punitive

damages will be held at a date to be determined by this Court.

SO ORDERED.


Dated:  January 11, 2013
          Buffalo, New York

<u>/s/William M. Skretny</u><br>
WILLIAM M. SKRETNY<br>
Chief Judge<br>
United States District Court

46